767 A.2d 348

**Millicent KASSAMA, Individually, etc.**

**v.**

**Aaron H. MAGAT, et al.**

**No. 837, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Feb. 28, 2001.

638

640

Matt R. Ballenger (T. Christine Pham and Suder & Suder, P.A., on the brief), Baltimore, for appellant.

E. Dale Adkins, III (Lynne B. Malone, Gregory L. VanGeison and Anderson, Coe & King, LLP, on the brief), Baltimore, for appellees.

Argued before SALMON, MOYLAN,* and GEORGE J. HELINSKI, (Ret., Specially Assigned), JJ.

SALMON, Judge.

In this "wrongful life" case, an infant plaintiff asserts that she would have been better off if she had never been born and that she should have been aborted. This presents a question of first impression in Maryland, *viz:*

> May a doctor whose negligence caused a mother not to abort her pregnancy be successfully sued for "wrongful life" by a genetically defective child born as a consequence of the doctor's negligence?

We hold that Maryland does not recognize a cause of action for wrongful life and, accordingly, answer that question in the negative.

Other issues that arose out of a companion "wrongful birth" claim must also be decided.[1]

---

* Moylan, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. We use the terms "wrongful birth" and "wrongful life" merely as convenient legal shorthand. We nevertheless recognized that the Court of Appeals has frowned on that word usage, calling it "not instructive." *Reed v. Campagnolo,* 332 Md. 226, 237, 630 A.2d 1145 (1993). In *Reed,* the Court said:

> The principal contentions of the defendant physicians turn on how one conceptualizes the tort alleged by the Reeds. Highly relevant to that consideration are the observations by the Supreme Judicial Court of Massachusetts concerning the terminology, "wrongful life," "wrongful birth," and "wrongful conception."
>
> "These labels are not instructive. Any 'wrongfulness' lies not in the life, the birth, the conception, or the pregnancy, but in the negligence of the physician. The harm, if any, is not the birth itself but

## I. *PROCEDURAL AND FACTUAL BACKGROUND*

On September 19, 1995, a daughter, Ibrion Fatuo Kassama, was born to Millicent Kassama. The delivery was uneventful; unfortunately, however, Ibrion was born with Down's Syndrome.[2] During her pregnancy, Mrs. Kassama was treated by Dr. Aaron H. Magat, a board-certified obstetrician and gynecologist.

Mrs. Kassama, individually and on behalf of Ibrion, filed suit in the Circuit Court for Baltimore County against Dr. Magat, his professional association, and one of his associates.[3] The complaint contained counts for negligence and lack of informed consent. Mrs. Kassama alleged, *inter alia*, that, but for Dr. Magat's negligence, she would have had an abortion and would not have delivered Ibrion (hereinafter "the wrongful-birth claim"). In her wrongful-birth claim, Mrs. Kassama, individually, claimed economic damages caused by the necessity of raising her genetically defective child.

---

the effect of the defendant's negligence on the [parents] resulting from the denial to the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect."
*Id.* (quoting *Viccaro v. Milunsky,* 406 Mass. 777, 551 N.E.2d 8, 10 n. 3 (1990)).

2. Down's Syndrome is a genetic disorder that causes numerous abnormalities, including "mental retardation, retarded growth, flat hypoplastic face with short nose, prominent epicanthic skin folds, small low-set ears with prominent antihelix, fissured and thickened tongue, laxness of joint ligaments, pelvic dysplasia, broad hands and feet, stubby fingers, and transverse palmar crease. Lenticular opacities and heart disease are common. The incidence of leukemia is increased and Alzheimer's disease is almost inevitable by age 40...." PHYSICIAN DESK REFERENCE MEDICAL DICTIONARY 1728 (1st ed.1997).

3. Named in the suit, besides Dr. Magat, were Ralph B. Epstein, M.D., one of Dr. Magat's associates, and Marvin M. Sager, M.D. & Ralph B. Epstein, M.D., P.A. Dr. Epstein was later dismissed from the suit. The professional association changed its name to Epstein & Magat, M.D., P.A., after suit was commenced. At trial, all parties stipulated that Dr. Magat was an employee of Epstein & Magat, M.D., P.A., and that, at all relevant times, he was acting within the scope of his employment. Consequently, the parties agreed that any judgment against Dr. Magat would be against Epstein & Magat, M.D., P.A., as well.

On behalf of Ibrion, Mrs. Kassama filed a claim for wrongful life based on negligence and lack of informed consent theories. Prior to trial, the court granted the defendants' motion for partial summary judgment as to Ibrion's claim of lack of informed consent.

The case was tried before a jury in the Circuit Court for Baltimore County. At the close of the plaintiff's case, the trial court granted the defendants' motion for judgment as to Ibrion's claim of negligence, as well as Mrs. Kassama's lack of informed consent claim.[4] Thus, only Mrs. Kassama's wrongful-birth claim was considered by the jury.

The jury found that Dr. Magat had breached the applicable standard of care and that the breach was a proximate cause of Mrs. Kassama's injury. The jury also found that Mrs. Kassama was contributorily negligent and that her negligence was a proximate cause of her own injury.

After the trial judge considered and denied Mrs. Kassama's motion for judgment notwithstanding the verdict, and motion for new trial, a timely appeal was filed by Mrs. Kassama, individually and on behalf of Ibrion. The defendants responded by filing a conditional cross-appeal.

## II. *QUESTIONS PRESENTED*

Several of the questions raised by Mrs. Kassama deal with damages and need not be decided.[5] The questions that must be resolved are:

---

**4.** The trial court did not err in dismissing the lack of informed consent claims of Ibrion and Mrs. Kassama. *See Reed v. Campagnolo,* 332 Md. 226, 240–41, 630 A.2d 1145 (1993).

**5.** Those three questions are:
1. Did the trial court err in excluding any evidence as to post-majority damages?
2. Did the trial court err in instructing the jury that any damages suffered by Mrs. Kassama were to be offset by any non-economic benefit she suffered as a result of the birth of her daughter.
3. Did the trial court err in allowing evidence of the availability of public services in contravention of the collateral source rule?

1. Did the trial court err in allowing the jury to consider the issue of whether Mrs. Kassama was contributorily negligent?

2. Assuming that the answer to Question No. 1 is "no," did the trial court err in failing to give the jury a last clear chance instruction?

3. Did the trial court err in granting Dr. Magat's motion for judgment in regard to Ibrion's wrongful-life claim?

We answer all three questions in the negative. Because we shall affirm the judgment entered in favor of the defendants, it is unnecessary to decide the issues raised in the cross-appeal.[6]

### III. *MEDICAL BACKGROUND*

An alpha fetoprotein ("AFP") blood test is used to detect genetic defects. Ideally, the blood sample for the AFP test is drawn when a woman is fifteen to sixteen weeks pregnant, but it is acceptable to obtain a blood sample as late as nineteen weeks.[7] An abnormally high AFP test score indicates that the fetus may have spina bifida, open spinal cord congenital abnormalities, or certain other serious potential problems. An abnormally low score is associated with Down's Syndrome.

Even if an AFP test shows an increased risk of Down's Syndrome or other serious potential problems, the test is not definitive—it merely shows a potential problem. To find out

---

**6.** The cross-appeal questions were:
 1. Did the trial court err in ruling that a genetic counselor could not be called to testify that Mrs. Kassama had told her that she would not have aborted Ibrion?
 2. In the event of a remand for new trial, should the trial be as to both liability and damages?

**7.** The fifteenth to nineteenth week range is based upon uncontradicted evidence presented at the trial of the subject case. In *Reed v. Campagnolo*, 332 Md. at 230, 630 A.2d 1145, the parties apparently agreed that the AFP test "must be performed between weeks 16 and 18 of the pregnancy to obtain reliable results." On the other hand, in *Basten v. United States*, 848 F.Supp. 962, 965 (M.D.Ala.1994), the Court noted that "for clinical and practical purposes, [the AFP test] must be administered within a narrow time frame during pregnancy (sixteen – twenty weeks)."

for certain whether a fetus is afflicted with certain genetic problems, the mother must undergo an amniocentesis, a test whereby a physician, with the assistance of an ultrasound machine, extracts genetic material from the fluid in the sac surrounding the fetus. The material extracted is sent to a laboratory that grows the cells contained in the fluid in order to obtain a genetic profile. Once the results of an amniocentesis is known, the mother must consider the test results and, assuming there is still time for an abortion, decide whether she wants to abort the pregnancy. The parties agreed at trial that if an amniocentesis had been performed in this case it would have shown that the fetus Mrs. Kassama was carrying had Down's Syndrome.

■ In *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), Judge Blackman noted that the normal term of human pregnancy is 266 days (38 weeks). When *Roe* was decided, it was believed that a fetus was viable [8] "at about seven months (28 weeks) but [that viability] may occur earlier, even at 24 weeks." *Id.* at 160, 93 S.Ct. 705. (Citing L. Hellman & J. Pritchard, *Williams Obstetrics* 493 (14th ed.1971)). More recently, in *Planned Parenthood v. Casey*, 505

---

8. "Viability" means "potentially able to live outside the mother's womb, albeit with artificial aid." *Roe v. Wade*, 410 U.S. at 160, 93 S.Ct. 705. The *Roe* Court said:

 A state criminal abortion statute of the current Texas type, that excepts from criminality only a *lifesaving* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.
 (a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.
 (b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.
 (c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.
 *Id.* at 164–65, 93 S.Ct. 705.

U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), Justice O'Connor observed that viability sometimes occurs as early as twenty-three weeks.[9] *Id.* at 860, 112 S.Ct. 2791.

## IV. *MARYLAND'S ABORTION LAWS*

There is no statutory time limitation in Maryland after which a genetically defective fetus or one suffering from a "serious deformity or abnormality" may not be terminated. In this regard, section 20–209(b) of the Health General article of the Annotated Code of Maryland (2000 Repl.Vol.) reads:

(b) *State Intervention.* Except as otherwise provided in this subtitle, the State may not interfere with the decision of a woman to terminate a pregnancy:

(1) Before the fetus is viable; or

(2) At any time during the woman's pregnancy, if:

(i) The termination procedure is necessary to protect the life or health of the woman; or

(ii) The fetus is affected by genetic defect or serious deformity or abnormality.

As will be seen, however, the fact that Maryland's abortion law is extremely liberal does not mean that a woman can find a Maryland doctor who will perform an abortion at any time merely because the mother is carrying a genetically defective fetus.

## V. *TRIAL TESTIMONY* [10]

### A. *Dr. Magat's Version of Events*

Mrs. Kassama first visited Dr. Magat's office on April 19, 1995. On that date, an ultrasound test showed that the

---

**9.** "The survival of infants born from 23 to 25 weeks of gestation increases with each additional week of gestation. However, the overall neonatal survival rate for infants born during this early gestational period remains less than 40%." American Academy of Pediatrics Committee on Fetus and Newborn, *Perinatal Care at the Threshold of Viability,* 96 Pediatrics 974 (1995).

**10.** We have limited our summary of trial testimony by only recounting evidence germane to liability issues.

gestational age of Mrs. Kassama's fetus was seventeen weeks, four days.

Dr. Magat noted on his patient's chart that Mrs. Kassama was a "late registrant," meaning that she had come to him late in her pregnancy. He ordered blood work, including an AFP test. The doctor filled out a form for Mrs. Kassama to have the blood drawn and referred her to a laboratory, which was within walking distance from his office, where the blood was to be drawn and analyzed. Dr. Magat dated the blood work requisition slip for the next day—April 20, 1995—when he expected that the blood for the AFP test would be drawn.

Dr. Magat told Mrs. Kassama to have the blood work done "as soon as possible." He also told his patient:

I am going to give you two more slips. Those slips . . . are for basically [an] AFP test, the test we want to get between 15 and 19 weeks and I, again, briefly went over, obviously, as we talked about, screenings for spina bifida.

* * *

I explained, again, [the] AFP test, what it screens for. I also gave her a slip for official ultrasound. We are were [sic] approaching 18 weeks. The best criteria I had to go with at this point was my ultrasound in the office. I have I felt [sic] fairly confident I had gotten a good measurement, but I wanted to confirm my dates were correct as well as there were no anomalies or problems with the baby.

Dr. Magat next saw Mrs. Kassama on May 18, 1995, at which time Mrs. Kassama told him that she had the blood drawn for the AFP test on May 16, 1995.[11] She also said she

---

11. A two-page clinical requisition form prepared by Dr. Magat requested that an AFP test be performed. The form is dated April 20, 1995. At the bottom of the second page of this form is an informed consent verification, which reads:

I certify that informed consent for AFP testing has been obtained from this patient. *I have discussed the AFP Test with my patient and have consulted with her about the purpose of this test and the possible*

had obtained the second ultrasound on May 11, 1995. Because his patient had not had the blood work done as requested, Dr. Magat wrote on Mrs. Kassama's chart that she had been "non-compliant."

On May 19, 1995, at 3:15 p.m., Maryland Medical Med Path, the laboratory that analyzed Mrs. Kassama's blood sample, completed a report setting forth the AFP test results. The record does not show when the report was sent to Dr. Magat's office or when he received it, but Dr. Magat saw the report for the first time on May 25, 1995. The report showed that Mrs. Kassama had a one in fifty-seven chance of delivering a baby with Down's Syndrome.

Mrs. Kassama was thirty-one years old when Ibrion was born. The normal risk for a Down's Syndrome baby for someone of Mrs. Kassama's age is approximately one in 700.

On May 25, 1995, the gestational age of Mrs. Kassama's fetus was estimated to be twenty-two weeks and four days. According to the undisputed evidence in this case, no physician in Maryland will perform an abortion of a fetus with Down's Syndrome if the fetus is more than twenty-three weeks and six days old. Mrs. Kassama's fetus would reach twenty-three weeks and six days in nine days, i.e., on June 3, 1995. This presented a problem because it takes, on average, two weeks to obtain the results of an amniocentesis. According to Dr. Magat, there was no way to do a rush amniocentesis. The results can be obtained only after cells that surround the fetus are extracted and grown in a laboratory. It *usually* takes about fourteen days to obtain the results. It *always* takes a minimum of twelve days to get the test results—and sometimes as much as seventeen days—according to Dr. Magat.

---

> results, and that additional testing may be necessary depending on the AFP results. . . .

(Emphasis added.)

Below this informed consent verification are signature lines for both the patient and the physician; to the right of Mrs. Kassama's signature is the date May 16, 1995. Dr. Magat did not sign the form.

Dr. Magat testified that even if he had received the AFP report on Friday, May 19th (the day the report was written), it would have taken at least until Monday—May 22nd to schedule an amniocentesis. By that date, only twelve days would have remained until June 3rd. Twelve days would have been insufficient time to have an amniocentesis, get the results, schedule an abortion, and perform one in Maryland.

Dr. Magat testified that as soon as he received the AFP results he called Mrs. Kassama. His testimony as to what he told his patient in the May 25, 1995, phone conversation was as follows:

[What] I explained to her was that I received the results of her ... AFP test and she came back very suspicious for Down's Syndrome. And that at that point, I thought it was the lowest I had seen. I have since seen lower results that have returned normal. But again, I told her I was suspicious about the possible results and also suspicious for Down's Syndrome. And unfortunately, she had, I explained to her that she had waited four weeks to get the results, that at this point, she was 22 weeks and four days. And at 22 weeks and four days, if you wanted to act on the results, we would get an amniocentesis and the amniocentesis takes about two weeks to get back and the results would come back at greater than 24 weeks, which would still be too late to act in the State of Maryland. But there were other states where she could still go. And at that point, she told me that she would not act on the results and she didn't want to do anything about it. So, I informed her that you can still get an amniocentesis, even if you wouldn't act on the results, but the amniocentesis does have a risk to it. Some people have miscarriages from having the amniocentesis. Some people believe if you won't act on the amniocentesis results, you probably wouldn't want to do the test just for the information. Again, she said [she] wouldn't act. I said, you should at least get genetic counseling to explore what options you have left. She said, I wouldn't do anything about it anyway. At that point, I didn't push it any further

and I decided to write a note in the chart. That's where you see the note from 5–25–95.

Dr. Magat wrote the following words in the margin of the Maryland Medical Met Path laboratory report that had notified him of the AFP test results: "Pt. [patient] informed. Needs genetic counseling, possible amnio." A note in Mrs. Kassama's chart, dated May 25, 1995, reads: "[Decreased] AFP. Pt. is now 22 weeks and four days (risk is one in 57)." Dr. Magat next wrote: "Patient offered amnio even though she would be greater than 24 weeks by the time the results returned." He then scratched out the words "offered" and the phrase "even though she." As corrected, the sentence read: "Pt. too late for amnio because she would be ... [more than] 24 weeks by the time the results returned." He explained why he scratched out the aforementioned words as follows:

I realized I already had that noted on the lab sheet. I wanted my notes here to reflect the lateness of the test and the lateness of the results and that in the State of Maryland, that she would be too late to act on the amniocentesis in the state because they [sic] would be greater than 24 weeks.

Dr. Magat acknowledged that if a fetus has Down's Syndrome a woman can get an abortion in New York when the fetus is up to twenty-six weeks of gestational age and that in Kansas it is possible to obtain an abortion for a Down's Syndrome fetus up to twenty-eight weeks. Upon cross-examination, he also made the following concessions:

Q: So we can agree that if, in fact, you or anybody from your office never contacted Mrs. Kassama about the results of that AFP and didn't communicate the options available to her, that you would be in the breach of the standard of care, correct?

A: I would agree with that, sir.

Q: Again, just like I asked Doctor Katz, one of the experts you retained on your behalf yesterday, let's take it one step further. If you called Mrs. Kassama up, reported the AFP test as being low, but told her that it was too late to have an amnio, because it would be greater than 24

weeks and she wouldn't be able to act upon it, if that was the information you gave her, you would have been in breach of the standard of care as well?

A: Hypothetically.

Q: Yes, hypothetically, because I know—

A: Yes, yes.

### B. *Mrs. Kassama's Version of Events*

At trial, Mrs. Kassama could not recall when Dr. Magat told her to have the AFP test.[12] She adamantly maintained, however, that Dr. Magat could not possibly have asked her to have the blood drawn on April 20th, because she always followed Dr. Magat's instructions promptly. Therefore, if he had asked her to have the blood drawn on April 20th, she would have done so. Mrs. Kassama believed that Dr. Magat must have asked her to take the test on May 16, 1995, the date she signed her informed consent verification and the date the blood was drawn for that test. Mrs. Kassama's strong views in this regard are revealed by the following colloquy:

Q [Defense Counsel]: Now, that would be consistent with your memory that Doctor Magat always asked you to get the testing done that day or the next day, right?

A: Exactly, um-hum. (Indicating affirmatively.)

Q: Is it your testimony to this Jury that you went on April 20th to get the testing done, as you were requested to do?

A: If I was requested to do it.

Q: No, that's not my question. I am sorry, let me ask it again. Is it your memory that you went on April 20th to get the testing done?

A: Testing for what, sir?

---

12. In her complaint and answers to interrogatories, Mrs. Kassama asserted that Dr. Magat never ordered an AFP test.

* * *

Q: Testing for the AFP and the other studies that were ordered by Doctor Magat, according to the medical records in that first visit?

A: Anything that Doctor Magat gave me to have completed was done. Whenever he told me to, I mean, even I did the ultrasound. Why would I wait until the 16th when I did the ultrasound on the 11th [of May]? Why would I skip having the blood test done?

* * *

Q: Even if the log of the lab where the AFP test was done ... shows that on May 16th you came and you had the blood drawn for the AFP test, that's wrong, because if you were told to get it on April 20th, you wouldn't have waited four weeks, would you?

A: That's why I don't think I was told on April 20th. I mean, you are telling me to look at April 20th on the top of that form. Right at the bottom is 5/16.

Mrs. Kassama testified that she was never advised by Dr. Magat of the results of the AFP test or of the option of having an amniocentesis or an abortion. Put more bluntly, she claimed that the phone call testified to by Dr. Magat never took place on May 25th or on any other date.

Mrs. Kassama testified that if she had known of the AFP test results and had been offered the opportunity she would have had an amniocentesis. She also testified that if she had been informed after the amniocentesis that she was carrying a fetus with Down's Syndrome, she would have had an abortion either in Maryland or, if necessary, out of state.

### C. *The Experts*

Plaintiff called two obstetricians and gynecologists ("Ob–Gyns") to testify on her behalf, i.e., Dr. Leonard LaBua and Dr. Lawrence Borow. The defense also called an Ob–Gyn, Dr. John Katz.

## 1. Dr. Leonard LaBua

Dr. LaBua was board certified as an Ob–Gyn in 1969. Since 1990, he has restricted his practice to forensic medicine—reviewing medical malpractice cases and, when necessary, testifying at depositions and in court.

On direct examination, plaintiff's counsel and Dr. LaBua had the following exchange concerning the May 19th report showing that Mrs. Kassama had a one in fifty—seven chance of delivering a child with Down's Syndrome:

Q: Now, on May 19th, 1995, Doctor, how many weeks was Ms. Kassama in her pregnancy?

A: I think on the 19th she was approximately 21.2 weeks.

Q: Doctor, assuming that this report was available to Dr. Magat or his office on the 19th, can you tell us, do you have an opinion, a reasonable degree of medical probability, as to whether there would be sufficient time to order or offer the patient amniocentesis with the ultimate goal, should it come back positive, to terminate her pregnancy?

A: Yes, very definitely.

Dr. LaBua further testified that even assuming that by the time the AFP report was completed it was too late to have an abortion in Maryland, and assuming that Dr. Magat told Mrs. Kassama of the AFP results but also told her it was too late to have a Maryland abortion, Dr. Magat nevertheless would have breached the applicable standard of care if he failed to also tell her that she had the option of terminating the pregnancy out of state, i.e., in New York, Kansas, or Arkansas.

Dr. LaBua was cross-examined closely and effectively as to whether—as of Friday, May 19th—there was still time to have an abortion in Maryland. First of all, according to Dr. Magat's records, as of May 19th, Mrs. Kassama was twenty-one weeks, six days pregnant, not twenty-one weeks, two days, as he had assumed. That left only fifteen days until June 3, 1995. Dr. LaBua (impliedly) admitted this when he testified that on May 25th there were only nine days left to have an

abortion in Maryland. Dr. LaBua also admitted on cross-examination that, even if Dr. Magat received the AFP report the minute it was signed, it would take until at least Monday, May 22, 1995, to consult with his patient and have an amniocentesis both scheduled and performed. By May 22nd, only twelve days remained until the June 3rd deadline. According to Dr. LaBua it usually took between ten and fourteen days to receive the results of an amniocentesis.

### 2. Dr. Lawrence Borow

Plaintiff introduced the videotaped deposition of Dr. Lawrence Borow, an Ob–Gyn who practices in Pennsylvania. Dr. Borow testified that the results of an amniocentesis could be obtained by a "rush technique" in only seven days and therefore as of May 19th there was "more than adequate time" to have genetic counseling, obtain the results of an amniocentesis, and schedule and perform an abortion before the fetus was twenty-four weeks old. Moreover, even on May 25, 1995, when the fetus was twenty-two weeks, five days old, the nine days remaining were sufficient to have the counseling, review the amniocentesis results, and abort the fetus.

Plaintiff's counsel asked:

If you have—if you tell a patient, look, I got your alpha fetoprotein results back, you have a 1 in 57 chance of having a Down's Syndrome, now the next test that we can do to give a definitive diagnosis is amniocentesis, but it's too late for you to act upon those results, is that a form of genetic counseling?

The witness answered:

It's certainly what Dr. Magat would describe as a crude form of genetic counseling. And that's what, in fact, in my opinion occurred here and is reflected in Dr. Magat's note.

### 3. Dr. John Katz

The defense called Dr. John Katz, a board certified Ob Gyn from Baltimore County, Maryland. Dr. Katz testified that to his knowledge no physician in Maryland would perform an

abortion of a Down's Syndrome fetus once the fetus reaches the age of twenty-four weeks. Dr. Katz also testified that on average it usually takes fourteen days to obtain the results of an amniocentesis. On rare occasions, the results can be obtained in twelve to thirteen days, but sometimes it takes more than fourteen days. As an example, Mrs. Kassama's medical records showed that it took sixteen days to obtain amniocentesis results when Mrs. Kassama had that procedure performed during her 1998 pregnancy. The speed with which the results may be obtained does not depend on the laboratory; instead, it is dependent upon how quickly the cells grow. Dr. Katz agreed with Dr. Magat that there was no such thing as a "rush technique" that could speed up the cell growth process. More specifically, he knew of no facility that could obtain the amniocentesis results in seven days—as Dr. Borow testified.

Dr. Katz said that even if Dr. Magat received the AFP results on Friday, May 19, 1995, the earliest he would have been able to schedule an amniocentesis was Monday, May 22nd—which left only a window of twelve days to perform an abortion in Maryland. This was insufficient time to have an abortion in Maryland because an amniocentesis showing a genetic defect would first be required.

Dr. Katz agreed with all the other doctors who testified that in New York and Kansas abortions could be obtained after the fetus was twenty-four weeks old. He also agreed with the other experts that the standard of care required an Ob Gyn to either tell his patient of her out-of-state options or to refer her to genetic counseling.

## VI. *MOTION FOR JUDGMENT ON ISSUE OF CONTRIBUTORY NEGLIGENCE*

At the end of the entire case, Mrs. Kassama's counsel made a motion for judgment as to the issue of contributory negligence. Counsel argued:

I realize from just a gut level feeling one would think that the issue of contributory negligence has been generated.

But in order to have the issue of contributory negligence go to the jury, the burden is on the defendant in [the] exact same fashion as the burden of primary negligence is on the plaintiff. And there's four elements to any negligence or contributory negligence: Duty, breach, causation and harm.

I think we can all agree that a patient has a duty to act reasonably. So clearly, that, I think, has been established and that's there. Clearly, in this case the defense has set forth a theory that she was given the blood tests or told to go on April 19th or 20th, and there is evidence to suggest, obviously, we hotly dispute that that is what occurred, but the purpose of my argument, I agree there's evidence that would suggest that Mrs. Kassama waited four weeks to get the test. The problem that the defense has is that's all they can show. They can't take the next step and show that there was any harm or causation that she created herself. . . .

The trial judge ruled that although the evidence was conflicting on many points the defendants had presented evidence that, if believed, would make the issue of whether Mrs. Kassama's negligence had contributed to her own injury a jury question.

## VII. *ISSUE 1*

### *Contributory Negligence—Sufficiency of Evidence*

Appellant admits here, as she did in the lower court, that there was evidence, if believed, from which the jury could reasonably find that she was negligent in waiting approximately four weeks to have the AFP test.[13] Appellant maintains, however, that the jury could not have reasonably concluded

---

**13.** She says in her brief:

Mrs. Kassama acknowledges that reasonable minds could differ on whether she obtained the AFP testing when ordered or whether she waited approximately four weeks to obtain the test. A jury could have thus found that Mrs. Kassama breached a duty to herself by her delay in getting the AFP test.

that her negligence proximately caused her injury. Appellant argues:

> The [d]efendant's evidence to the effect that Mrs. Kassama chose not to terminate the pregnancy only served to negate [p]laintiff's proximate cause, not to show any independent proximate cause of [p]laintiff's contributory negligence. If the jury had believed that Mrs. Kassama would not have terminated the pregnancy regardless of the results of the amniocentesis, *it would have been legally impossible for them [sic] to have found that Defendant Magat proximately caused her injury.*

(Emphasis added.)

■ According to appellant: "Under the evidence presented in this case, both the plaintiff and the defendant could not have proximately caused the injury; the proximate cause by one party necessarily excludes proximate cause by the other party." We disagree.

"Contributory negligence is that degree of reasonable and ordinary care that a plaintiff fails to undertake in the face of an appreciable risk which cooperates with the defendant's negligence in bringing about the plaintiff's harm." [*Board of] County Commissioners [of Garrett County] v. Bell Atlantic[–Maryland, Inc.], 346 Md. 160, 180, 695 A.2d 171 (1997); ....
*McQuay v. Schertle,* 126 Md.App. 556, 568, 730 A.2d 714 (1999).

■ "Contributory negligence, if present, defeats recovery because it is a proximate cause of the accident; otherwise, the negligence is not contributory." *Batten v. Michel,* 15 Md.App. 646, 652, 292 A.2d 707 (1972).

■ Any legally sufficient evidence of negligence, however slight, must be submitted to a jury to be weighed and evaluated. *Fowler v. Smith,* 240 Md. 240, 246, 213 A.2d 549 (1965). "[T]he truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending

to establish negligence drawn." *Id.* The question of negligence becomes a matter of law only when reasonable minds could not differ. *Union Mem'l Hosp. v. Dorsey,* 125 Md.App. 275, 282, 724 A.2d 1272 (1999).

 In order to prove the proximate cause of an injury, a party "is permitted to rely on circumstantial evidence. Direct testimony is not essential." *McSlarrow v. Walker,* 56 Md. App. 151, 159, 467 A.2d 196 (1983). Meager evidence of each of the elements of contributory negligence is sufficient to establish a jury question. *Fowler,* 240 Md. at 246, 213 A.2d 549; *McSlarrow,* 56 Md.App. at 159, 467 A.2d 196.

It is true, as appellant argues, that, if the jury believed Dr. Magat's testimony that he advised appellant of the AFP test results and that appellant then told him that she would not have an abortion regardless of what the amniocentesis results might be, it would have been impossible for a jury to find that Dr. Magat's negligence proximately caused appellant's injury (failure to abort the fetus). But, based on circumstantial evidence, the jury could have found Dr. Magat negligent under a completely different theory.

As mentioned earlier, one of Dr. Magat's notes in Mrs. Kassama's chart read: "Pt. too late for amnio because she would be more than 24 weeks by the time the results returned." The jury could have believed that Dr. Magat told Mrs. Kassama of the AFP results and also advised her that it was too late to have an abortion in Maryland but did not tell her that she could still have an abortion out of state. Mrs. Kassama's attorney asked Dr. Borow about this possible scenario, which is strongly suggested by the just-quoted revised note Dr. Magat made in Mrs. Kassama's chart. He made no mention in that note of the possibility of an out-of-state abortion. Regarding this scenario, Dr. Borow said: "That's what, in fact, in my opinion, occurred here and is reflected in Dr. Magat's notes."

Based on Dr. Magat's notes or based upon Dr. Borow's opinion (or a combination of the two) the jury could have believed that Dr. Magat simply did not know that out-of-state

doctors would abort a Down's Syndrome fetus after twenty-four weeks and for that reason failed to tell Mrs. Kassama of her out-of-state abortion options. Alternatively, the jury could have believed that Dr. Magat knew of the out-of-state option but failed to mention it.

■ There can, of course, be more than one proximate cause of an injury. *Stickley v. Chisholm*, 136 Md.App. 305, ——, 765 A.2d 662, 665 [No. 2962, Sept. Term, 1999, slip op. at 9 (Jan. 18, 2001)]. In fact, the concept of contributory negligence is founded upon that principle.

Appellant cites *Myers v. Bright*, 327 Md. 395, 407, 609 A.2d 1182 (1992), for the well-established proposition that "[n]egligence that does nothing to cause a mishap cannot create accountability." But in the case *sub judice* the jury could have found that Mrs. Kassama's negligence had a great deal to do with her failure to have an abortion.

■ A patient has a duty to cooperate with her physician by following his or her instructions regarding treatment and tests. This is especially true in situations like the one in which Mrs. Kassama, as a late registrant, found herself on April 19, 1995. By the time she decided to have the AFP test, she had delayed so long that her fetus was on the cusp of viability.

There was evidence from which the jury could have found:

1. Dr. Magat, on April 19th, explained to Mrs. Kassama the purpose of the AFP test and told her that it was to be performed between the fifteenth and nineteenth week of pregnancy.

2. Dr. Magat told Mrs. Kassama to have the AFP test "as soon as possible."

3. As of April 19th, Mrs. Kassama knew that she was almost eighteen weeks pregnant—yet she waited for almost four weeks—which put her well beyond her nineteenth week—to have the blood drawn for the AFP test.

4. By delaying nearly four weeks in having the genetic test, "Mrs. Kassama breached a duty to herself." (See n. 13, *supra.*)

5. If Mrs. Kassama had followed her doctor's orders, Dr. Magat would have had plenty of time to handle her pregnancy in the usual fashion, i.e., schedule an amnio-centesis, obtain the amniocentesis results, and, if requested, arrange for an abortion in Maryland.

6. Because Mrs. Kassama failed to follow her doctor's orders, her case went from the routine—to one where any abortion performed would come extremely late in her pregnancy—so late that no doctor in Maryland would abort the fetus—even though such an abortion would not have been prohibited by state law.[14]

In her brief, Mrs. Kassama focuses on the fact that her own negligence would have caused her no harm but for Dr. Magat's subsequent negligence. If, on May 25, 1995, Dr. Magat failed to tell his patient that she could still get an abortion out of state, and if Mrs. Kassama was, in fact, willing to travel out of state for an abortion, this is true. But the fact that there would have been no injury but for Dr. Magat's negligence is not dispositive. In any case where both primary and contributory negligence are proven, it is always true that the plaintiff would have suffered no injury had the defendant not also been negligent.

Although she does not phrase her argument as such, Mrs. Kassama contends, in effect, that (1) Dr. Magat's negligence was a superseding cause of her injury; and (2) a superseding cause negates a defendant's contributory negligence defense. Intervening negligence is a superseding cause if it is not reasonably foreseeable. *Baltimore Gas & Elec. Co. v. Lane*, 338 Md. 34, 52, 656 A.2d 307 (1995). When the issue is whether a defendant is guilty of primary negligence, a third

---

**14.** The apparent reason for the refusal to abort at twenty-four weeks is that at least some fetuses can survive outside their mothers' wombs at that gestational age. *See Roe*, 410 U.S. at 160, 93 S.Ct. 705.

party's intervening negligence that is a superseding cause absolves a defendant from his or her act of negligence. *Id.* But recently, in *May v. Giant Food, Inc.,* 122 Md.App. 364, 712 A.2d 166 (1998), we held that "for purposes of contributory negligence, the issue of whether the defendant's act of primary negligence constitutes an intervening or superseding cause is properly analyzed as a question of proximate causation and foreseeability"—not under a superseding cause analysis. *Id.* at 391, 712 A.2d 166. At bottom, however, the matter comes down to a question of semantics rather than substance. *See Rawl v. United States,* 778 F.2d 1009 (4th Cir.1985), where the Court said:

> The problem of whether the superseding and intervening negligence theory is available only for the benefit of defendants may, however, be simply no more than a matter of labels, for the doctrine of intervening and superseding negligence is very similar to a rule of law which allows a plaintiff to avoid the consequences of contributory negligence by showing that his own negligence did not proximately cause the injury he suffered. *Thus, contributory negligence will not bar recovery where the plaintiff can show that his own conduct did not expose him to a foreseeable risk of the particular injury that in fact occurred through the negligence of the defendant.* The doctrine has been characterized in terms of lack of proximate cause: if the harm that occurred was not a foreseeable hazard of plaintiff's negligence, the plaintiff may recover from defendant. The proximate cause of the injury was the defendant's intervening negligence, and the causal connection between the plaintiff's negligence and the injury was broken.

*Id.* at 1015 n. 11 (emphasis added) (citation omitted).

In *Yonce v. SmithKline Beecham Clinical Labs., Inc.,* 111 Md.App. 124, 680 A.2d 569 (1996), we said:

> Two subparts comprise the element of proximate cause. [T]he element of proximate cause is satisfied if the negligence is 1) a cause in fact of the injury and 2) a legally cognizable cause.

*Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 51, 656 A.2d 307 (1995). Our courts have used two tests when determining whether a defendant's negligence is the cause in fact of a plaintiff's injury. Respectively, they are described as the "but for" and "substantial factor" tests.

*Id.* at 137–38, 680 A.2d 569.

The *Yonce* Court, after discussing the "but for" and "substantial factor" tests, went on to say:

Regardless of the test employed, the focus remains on the fundamental and sometimes metaphysical inquiry into the nexus between the defendant's negligent act and the resultant harm to the plaintiff. If there is no causation in fact, we need go no further for our inquiry has reached a terminal point. If, on the other hand, there is causation in fact, our inquiry continues.

If causation in fact exists, a defendant will not be relieved from liability for an injury if, at the time of the defendant's negligent act, the defendant should have foreseen the "general field of danger," not necessarily the specific kind of harm to which the injured party would be subjected as a result of the defendant's negligence. This is in accord with the Restatement (Second).

§ 435. Foreseeability of Harm or Manner of Its Occurrence.

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

*Id.* at 139, 680 A.2d 569 (citations omitted).

 Although the aforementioned language is geared to determinations of proximate cause as it relates to primary

negligence, there is no legitimate reason why the same language should not be modified and then utilized to establish the test of whether a plaintiff's negligence proximately caused her own injury. As modified, the test is: (1) If the plaintiff's conduct is a substantial factor in bringing harm to herself, the fact that the plaintiff neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent the plaintiff from being guilty of contributory negligence, and (2) the plaintiff's conduct may be held not to be a legal cause of harm to herself where, after the event and looking back from the harm to the plaintiff's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

Taking the evidence in the light most favorable to the appellees, there was evidence from which the jury could find that Mrs. Kassama's inaction was a cause in fact of her injury because, if she had not delayed in getting the AFP test, her amniocentesis and abortion would have been accomplished routinely in Maryland. Likewise, a jury question was presented as to whether appellant should have foreseen the general field of danger that her nearly four weeks of delay might occasion. Evidence germane to the foreseeability issue was: (1) Mrs. Kassama knew that the purpose of the AFP test was to screen for genetic defects; (2) she also knew that the test should be performed between the fifteenth and nineteenth week of pregnancy; (3) Mrs. Kassama likewise knew that the fetus was almost eighteen weeks of gestational age when she first saw Dr. Magat; and (4) Mrs. Kassama was instructed to have blood drawn for the AFP test as soon as possible. Given the relatively late stage of her pregnancy, common sense would tell a woman in that predicament that a nearly four-week delay in having genetic testing might drastically affect her ability to have an abortion. Thus, her injury (failure to end her pregnancy) was within "the general field of danger" viewed from Mrs. Kassama's position. Moreover, we cannot say, as a matter of law, that, using hindsight, it was "highly extraordinary" that Mrs. Kassama's disregard of her doctor's clear instructions would lead to her own injury.

## VIII. *ISSUE 2*

### *Last Clear Chance*

Appellant argues: "Even if the trial court properly allowed the issue of contributory negligence to go to the jury, the trial court erred as a matter of law by failing to also instruct the jury on last clear chance." We disagree. Language used in the case of *Simmons v. Urquhart,* 101 Md.App. 85, 643 A.2d 487 (1994), is apposite. In *Simmons,* Judge Harrell for this Court said:

> The last clear chance doctrine "presupposes a perilous situation created or existing through both a defendant's negligence and plaintiff's contributory negligence and assumes that there was a time after such negligence has occurred when the defendant could, and the plaintiff could not, by the use of the means available, avert the accident." *Johnson v. Dortch,* 27 Md.App. 605, 614, 342 A.2d 326, *cert. denied,* 276 Md. 745 (1975) (examining last clear chance doctrine in a boulevard law case). *In the context of medical malpractice, a physician's act of primary negligence may not be used again to serve as the last clear chance of avoiding injuries. Myers v. [Estate of] Alessi,* 80 Md.App. 124, 135, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989) (*patient who failed to make follow-up appointment with physician was not entitled to argue that doctor's original failure to detect cancer was sufficient to establish fresh act of negligence*).

*Id.* at 108, 643 A.2d 487 (emphasis added).

In her brief, appellant relies on the first full sentence of the paragraph just quoted. Conveniently, however, she ignores the second sentence—which we have emphasized.

If Mrs. Kassama was contributorily negligent and Dr. Magat was negligent, then Dr. Magat could only have been negligent by his failure to tell Mrs. Kassama (after he received the AFP report) that there was still time to get both an amniocentesis and an out-of-state abortion—if an abortion was desired.[15] Dr. Magat's act of negligence was, of course,

---

15. Appellant admits this in her reply brief when she says: "The proximate cause of Mrs. Kassama's injuries is attributable only to the failure

subsequent to Mrs. Kassama's negligent failure to have the blood drawn for the AFP test "as soon as possible." Although Dr. Magat's negligence was last in time, his act of primary negligence "cannot be used again to serve as the last clear chance of avoiding injuries." *Id.*

In the portion of her brief dealing with the court's failure to give a last clear chance instruction, appellant makes no effort, whatsoever, to show some act of negligence on Dr. Magat's part prior to May 25, 1995, that caused her injury; instead, appellant merely uses the same May 25th act of primary negligence a second time and calls it a "last clear chance" to avoid harm.

Accordingly, appellant has failed to demonstrate that a last clear chance instruction was warranted.

## IX. *ISSUE 3*

As a result of being afflicted with Down's Syndrome, Ibrion is moderately retarded and has a congenital heart defect. In her wrongful-life claim, Ibrion seeks to recover for emotional pain and suffering, as well as recompense for the medical and educational expenses incurred (and to be incurred) as a consequence of being afflicted with Down's Syndrome.

Maryland, along with most other states, has recognized wrongful-birth suits like the one brought by Mrs. Kassama. *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993). As will be seen, however, the vast majority of courts that have considered the matter have rejected wrongful-life claims.

A wrongful-birth claim differs from a wrongful-life claim in that the latter is brought by or on behalf of the disabled child, and the damages claimed are different. *See generally* Alan J. Belsky, *Injury as a Matter of Law: Is this the Answer to the Wrongful Life Dilemma?*, 22 U. Balt. L.Rev. 185 (1993); Adam A. Milani, *Better Off Dead than*

of Defendant Magat to properly advise Mrs. Kassama of her options regarding the likelihood that the fetus carried a genetic defect."

*Disabled?: Should Courts Recognize a "Wrongful Living" Cause of Action When Doctors Fail to Honor Patients' Advance Directives?*, 54 Wash. & Lee L.Rev. 149 (1997); Comment, *"Wrongful Life": The Right Not To Be Born,* 54 Tul.L.Rev. 480 (1980); 62A Am.Jur.2d Prenatal Injuries, Etc. § 90 (1990). Using traditional negligence analysis, as has been used in other birth-related claims, a wrongful-life action asserts that the defendant/doctor owed a duty—directly or derivatively—to the infant plaintiff. *See* Hutton Brown et al., *Special Project: Legal Rights and Issues Surrounding Conception, Pregnancy, and Birth,* 39 Vand. L.Rev. 597, 750–55, 767 (1986). The gravamen of a wrongful-life action is the assertion that but for the physician's negligence the mother would have had an abortion and the child would never have had to experience the pain and expenses occasioned by injuries and/or diseases that the physician could have foreseen. *Id.* at 750. Because it was not the doctor who caused the defect, this amounts to an assertion on the part of the infant plaintiff, "not that [he or she] should not have been born without defects, but that [he or she] should not have been born at all." *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755, 760 (1984). The injury complained of in a wrongful-life lawsuit is life itself.

The Supreme Court of Pennsylvania, in *Ellis v. Sherman,* 512 Pa. 14, 515 A.2d 1327, 1329 (1986), took the view that wrongful-life claims should be rejected because the plaintiff could not prove a "legal injury." The Court explained:

> Thus an "injury" is a harm that is inflicted upon one person or entity by another. The condition about which the plaintiff complains, a diseased life, was inflicted upon the plaintiff not by any person, but by the plaintiff's genetic constitution. Thus, it may not be said that the plaintiff has suffered a legal injury, for even though his physical and mental condition is unfortunate, and even though this condition presumably would constitute a legal injury if it had been inflicted by some negligent or intentional act of anoth-

er, in this case, the condition was caused not by another, but by natural processes. It is not, therefore, a legal injury. *Id.*

The New York Court of Appeals articulated a different reason for rejecting wrongful-life claims when it ruled that such claims should not be allowed because of the impossibility of calculating damages. *Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978). The *Becker* Court said:

> Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standards or by whom would perfection be defined?
>
> \* \* \*
>
> Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependent *upon a comparison between the [child's] choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make.* Recognition of so novel a cause of action requiring, as it must, creation of a hypothetical formula for the measurement of an infant's damages is best reserved for legislative, rather than judicial, attention.

*Id.* at 812 (citations omitted) (emphasis added).

The impossibility of calculating damages is, of course, determinative, because it is a fundamental goal of tort law to put

the victim, insofar as it is possible to do so by compensatory damages, in the position that he/she would have been in if the defendant had not been negligent. *Tucker v. Calmar S.S. Corp.*, 356 F.Supp. 709, 711 (D.Md.1973). Twenty-three states have rejected wrongful-life claims based on the belief that it would be an impossible task to calculate damages based on a comparison between life in an impaired state and non-existence. *See Elliott v. Brown*, 361 So.2d 546 (Ala.1978); *Walker by Pizano v. Mart*, 164 Ariz. 37, 790 P.2d 735 (1990); *Lininger v. Eisenbaum*, 764 P.2d 1202 (Colo.1988); *Garrison v. Medical Ctr. of Del. Inc.*, 581 A.2d 288 (Del.1989); *Kush v. Lloyd*, 616 So.2d 415 (Fla.1992); *Atlanta Obstetrics & Gynecology Group v. Abelson*, 260 Ga. 711, 398 S.E.2d 557 (1990); *Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984); *Siemieniec v. Lutheran Gen. Hosp.*, 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987); *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630 (Ind. 1991); *Bruggeman v. Schimke*, 239 Kan. 245, 718 P.2d 635 (1986); *Pitre v. Opelousas Gen. Hosp.*, 517 So.2d 1019 (La.Ct. App.1987), *aff'd in part and rev'd in part on other grounds*, 530 So.2d 1151 (La.1988); *Viccaro v. Milunsky*, 406 Mass. 777, 551 N.E.2d 8 (1990); *Strohmaier v. Associates in Obstetrics & Gynecology, P.C.*, 122 Mich.App. 116, 332 N.W.2d 432 (1982); *Wilson v. Kuenzi*, 751 S.W.2d 741 (Mo.1988); *Greco v. United States*, 111 Nev. 405, 893 P.2d 345 (1995); *Azzolino v. Dingfelder*, 315 N.C. 103, 337 S.E.2d 528 (1985); *Smith v. Cote*, 128 N.H. 231, 513 A.2d 341 (1986); *Becker v. Schwartz, supra; Flanagan v. Williams*, 87 Ohio App.3d 768, 623 N.E.2d 185 (1993); *Ellis v. Sherman, supra;*[16] *Nelson v. Krusen*, 678 S.W.2d 918 (Tex.1984); *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975); *Beardsley v. Wierdsma*, 650 P.2d 288 (Wyo.1982).

The West Virginia Supreme Court, in *James G. v. Caserta*, 175 W.Va. 406, 332 S.E.2d 872 (1985), held that even if the child was injured, his injury was not caused by the physician's

---

**16.** As mentioned earlier, the *Ellis* Court gave as one of the reasons for rejecting wrongful-life claims the plaintiff's inability to prove injury. 515 A.2d at 1329. It also adopted the view that such claims should be rejected because it is impossible to calculate damages. *Id.*

negligence and for that reason rejected a wrongful-life claim. *Id.* at 881.

In *Phillips v. United States,* 508 F.Supp. 537 (D.S.C.1980), the Court held that the public policy of South Carolina barred a wrongful-life claim, notwithstanding the Court's finding that neither the speculative nature of the plaintiff's damages or the difficulty of identifying the child's injury would bar the child's recovery. *Id.* at 543–44. In reaching its decision, the *Phillips* Court focused on the " 'preciousness of human life.' " *Id.* at 543. Other states have adopted the "preciousness of human life" premise as an alternative ground to reject wrongful-life claims. *See, e.g., Blake v. Cruz,* 698 P.2d at 322; *Bruggeman v. Schimke,* 718 P.2d at 642; *Elliott v. Brown,* 361 So.2d at 548.

In eight states, the Legislature has acted affirmatively to prohibit wrongful-life claims by statute.[17] *See* Idaho Code § 5–334 (2000); Ind.Code Ann. § 34–12–1–1 (Michie 2000); Minn.Stat. § 145.424 (2000); Mo.Rev.Stat. § 188.130 (1999); N.D. Cent.Code § 32–03–43 (2000); 42 Pa. Cons.Stat. § 8305 (2000); S.D. Codified Laws § 21–55–1 (Michie 2000); Utah Code Ann. § 78–11–24 (2000).[18]

The seminal case recognizing a child's right to recover at least some damages in a wrongful-life action is *Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982). In the *Turpin* case, Dr. Adam Sortini examined James and Donna Turpin's daughter (Hope) and advised the parents that Hope's hearing was within normal limits. *Id.* at 956. Approximately one year later, the child was correctly diagnosed as

---

**17.** In Idaho, Missouri, and Pennsylvania, wrongful-life claims are prohibited by both case law and statute.

**18.** All of these statutes are virtually identical. The following excerpt from the Minnesota wrongful-life law is illustrative of the language used in the state statutes:

No person shall maintain a cause of action or receive an award of damages on behalf of that person based on the claim that but for the negligent conduct of another, the person would have been aborted. Minn.Stat. § 145.424 (2000).

being "stone deaf" as a result of a hereditary ailment. *Id.* In their complaint, the Turpins alleged that if they had known that Hope was deaf they would not have conceived their second child (Joy), who suffered from the same total deafness as did her sister. *Id.* The Turpins, on behalf of Joy, brought a wrongful-life action in which they sought:

(1) general damages for being "deprived of the fundamental right of a child to be born as a whole, functional human being without total deafness" and (2) special damages for the "extraordinary expenses for specialized teaching, training and hearing equipment" which she will incur during her lifetime as a result of her hearing impairment.

*Id.*

The trial court sustained a demurrer to the Turpins' wrongful-life action. *Id.* On appeal, the defendants/appellees took the position that Joy had suffered "no legally cognizable injury or rationally ascertainable damages as a result of their alleged negligence." *Id.* at 960.

In *Turpin,* the California Supreme Court recognized that there was a "critical difference between wrongful-life actions and the ordinary prenatal injury cases." *Id.* at 961. In the ordinary prenatal injury case, where some negligent act on the part of the defendant injures the fetus, the child would have been born healthy but for the defendant's negligence; however, in a wrongful-birth case,

the obvious tragic fact is that plaintiff never had a chance "to be born as a whole, functional human being without total deafness"; if defendants have performed their job properly, [the plaintiff] would not have been born with hearing intact, but—according to the complaint—would not have been at all.

*Id.*

The *Turpin* Court observed:

Because nothing defendants could have done would have given plaintiff an unimpaired life, it appears inconsistent with basic tort principle to view the injury for which defendants are legally responsible solely by reference to plain-

tiff's present condition without taking into consideration the fact that if defendants had not been negligent she would have not been born at all.

*Id.* (citations omitted).

The Court rejected the proposition that impaired life is always preferable to non-life, saying:

While it thus seems doubtful that a child's claim for general damages should properly be denied on the rationale that the value of impaired life, as a matter of law, always exceeds the value of non-life, we believe that the out-of-state decisions are on sounder ground in holding that—with respect to the child's claim for pain and suffering or other general damages—recovery should be denied because (1) it is simply impossible to determine in any rational or reasonable fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner.

*Id.* at 963.

In reaching this decision, the Court quoted from Justice Weintraub's separate opinion in *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689, 711 (1967):

Ultimately, the infant's complaint is that he would be better off not to have been. Man, who knows nothing of death or nothingness, cannot possibly know whether that is so.

We must remember that the choice is not being born with health or being born without it.... Rather the choice is between a worldly existence and none at all.... To recognize a right not to be born is to enter an area in which no one can find his way.

*Turpin,* 182 Cal.Rptr. 337, 643 P.2d at 963.

After rejecting the infant plaintiff's claim for general damages, the *Turpin* Court held that a plaintiff in a wrongful-life cause of action was entitled to recover damages for " 'extraordinary expenses for specialized teaching, training and hearing

equipment'" that she would incur during her lifetime because of her deafness. *Id.* at 965. According to the Court, these types of extraordinary expenses stood on a "different footing" than general damages. *Id.* After observing that parents, in wrongful-birth actions, were permitted to recover medical expenses incurred on behalf of a child born with disability, the Court said:

> Although the parent and child cannot, of course, both recover for the same medical expenses, we believe it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care. If such a distinction were established, the afflicted child's receipt of necessary medical expenses might well depend on the wholly fortuitous circumstances of whether the parents are available to sue and recover such damages or whether the medical expenses are incurred at a time when the parents remain legally responsible for providing such care.

*Id.* at 965. The distinction between general damages and "extraordinary expense" that the Court made was that the latter expenses were "both certain and readily measurable ... [and] in many instances ... vital not only to the child's well being but to his or her very survival." *Id.*

In *Siemieniec v. Lutheran Gen. Hosp.*, 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987), the Supreme Court of Illinois puts its finger on the essential flaw in the rationale of the *Turpin* opinion. The Court said:

> In awarding special damages, ... the *Turpin* court ignored the reasoning that prevented an award of general damages. The problem of establishing the fact of injury was simply passed over, and all discussion focused on the nonspeculative nature of a recovery for extraordinary medical expenses.

*Id.* at 700.

The reasoning of the *Turpin* Court has been criticized by many other commentators. As an example, the California Law Review published a case note shortly after *Turpin* was decided that criticized the Turpins' court decision. *See* Kurtis

J. Kearl, note, *Turpin v. Sortini: Recognizing the Unsupportable Cause of Action for Wrongful Life*, 71 Cal.L.Rev. 1278 (1983). We are in accord with the views expressed by the author of that note, who said:

> The court's recognition of the wrongful life cause of action is unjustified by traditional legal principles or sound public policy. The *Turpin* court failed to account fully and consistently for the fundamental flaw of the wrongful life claim— the inability to make the required comparison between the plaintiff's actual condition and nonexistence. Without this comparison, a plaintiff can never establish that she has suffered any detriment which would entitle her to recovery. While the court acknowledged this flaw, it nevertheless granted special damages to a plaintiff who could not demonstrate that she had suffered harm in being born. The policy considerations that led the court to contravene established legal principles do not require creation of a new cause of action. The same result could have been achieved through existing law without doing violence to traditional tort principles.[19]

> Attempts by the *Turpin* court and others to circumvent this fundamental obstacle to recovery have not adequately dealt with the inherent conceptual difficulties of the wrongful life claim. In view of the peculiar nature of this cause of action, the supreme court should have followed the unanimous consensus of the other jurisdictions that had considered the question and refused to allow any recovery in a wrongful life claim.

*Id.* at 1296–97.

Despite criticism such as those just mentioned, the Washington Supreme Court, in *Harbeson v. Parke–Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983), followed, with no deviation, the reasoning of the *Turpin* Court and disallowed general damages but allowed the plaintiff in a wrongful-life suit to

---

**19.** The existing law referred to is case law permitting wrongful-birth claims, or if the parents are "unavailable," statutes requiring the State to support the child.

recover damages covering the medical and educational needs of the child. *Id.* at 493.

Likewise, the Supreme Court of New Jersey, in *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984), also followed the lead of the *Turpin* Court and recognized a wrongful-life action but restricted monies recoverable to special damages for extraordinary medical expenses. *Id.* at 762. Like the *Harbeson* and *Turpin* Courts, the *Procanik* Court made "the analytical leap from injury to damages without explanation." Hutton Brown et al., *Special Project: Legal Rights & Issues Surrounding Conception, Pregnancy, and Birth,* 39 Vand.L.Rev. 597, 759 (1986). The *Procanik* Court, however, emphasized policy grounds that were somewhat different from those enunciated in *Turpin* and *Harbeson, viz:*

> Recovery of the cost of extraordinary medical expenses by either the parents or the infant, but not both, is consistent with the principle that the doctor's negligence vitally affects the entire family. *Gleitman[ v. Cosgrove,* 49 N.J. 22, 50, 227 A.2d 689 (1967)] (Jacobs, J., dissenting). As Justice Jacobs stated in *Gleitman:*

> > And while logical objection may be advanced to the child's standing and injury, logic is not the determinative factor and should not be permitted to obscure that he has to bear the frightful weight of his abnormality throughout life, and that such compensation as is received from the defendants or either of them should be dedicated primarily to his care and the lessening of his difficulties. Indeed, if this were suitably provided for in the ultimate judgment, the technical presence or absence of the child as an additional party plaintiff would have little significance. [*Id.*]

> Law is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become [an] instrument of injustice. Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the injustice of that result. The

right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the "wholly [fortuitous] circumstance of whether the parents are available to sue." *Turpin v. Sortini, supra,* 31 Cal.3d at 228, 643 P.2d at 965, 182 Cal.Rptr. at 348.

The present case proves the point. Here, the parents' claim is barred by the statute of limitations. Does this mean that Peter must forego medical treatment for his blindness, deafness, and retardation? We think not. His claim for the medical expenses attributable to his birth defects is reasonably certain, readily calculable, and of a kind daily determined by judges and juries. We hold that a child or his parents may recover special damages for extraordinary medical expenses incurred during infancy, and that the infant may recover those expenses during his majority.

*Procanik,* 478 A.2d at 762.

Judge Schreiver, dissenting in part in *Procanik,* countered:

[I]t is unfair and unjust to charge the doctors with the infant's medical expenses. The position that the child may recover special damages despite the failure of his underlying theory of wrongful life violates the moral code underlying our system of justice from which the fundamental principles of tort law are derived.

*Id.* at 772.

We adopt the view accepted by the highest courts of twenty-three of our sister states that have refused to recognize a cause of action for wrongful life because it is an impossible task to calculate damages based on a comparison between life in an impaired state and no life at all. Attempts by the highest courts in California, Washington, and New Jersey to circumvent this problem are unpersuasive.

For the foregoing reasons we hold that the trial judge did not err when he granted the defense motion for judgment as to Ibrion's wrongful-life claim.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.