OPINION OF THE COURT
Jasen, J.
From its earliest days, the common law steadfastly clung to the notion that "in civil court the death of a human being could not be complained of as an injury.” (Baker v Bolton, 1 Camp 493, 170 Eng Rep 1033 [KB, 1808].) Judicial hesitance to chart a novel course beyond the safe harbors afforded by prevailing legal theory, particularly the principle that a tort died with its victim (Huggins v Butcher, 1 Brown & Gold 205, 123 Eng Rep 756 [CP, 1607]), spurred legislative recognition of the cause of action since known as "wrongful death”. (See, generally, Prosser, Torts [4th ed], § 127.) Ironically, in the relatively brief period since the enactment of the first wrongful death statute (Fatal Accidents Act, 1846, 9 & 10 Viet, ch 93), evolving legal theory has come full cycle. Although no longer shackled by the conceptual difficulties formerly posed by a "wrongful death” action, courts have again been drawn toward the murky waters at the periphery of existing legal theory to test the validity of a cause of action for what has been genetically termed "wrongful life”.
In Becker v Schwartz, Dolores Becker, then 37 years of age, conceived a child in September, 1974. After Dolores and her husband, Arnold Becker, learned of the pregnancy in October, they engaged the services of defendants, specialists in the field of obstetrics and gynecology. Thereafter, from approximately the tenth week of pregnancy until the birth of their child, Dolores Becker remained under defendants’ exclusive care. Tragically, on May 10, 1975, Dolores Becker gave birth to a retarded and brain-damaged infant who suffers, and will *406 continue to suffer for the remainder of her life, from Down’s Syndrome, commonly known as mongolism.[1]
It is plaintiffs’ contention that throughout the period during which Dolores Becker was under the care of defendants plaintiffs were never advised by defendants of the increased risk of Down’s Syndrome in children born to women over 35 years of age. Nor were they advised, allege plaintiffs, of the availability of an amniocentesis test[2] to determine whether the fetus carried by Dolores Becker would be born afflicted with Down’s Syndrome.
Plaintiffs commenced this action seeking damages on behalf of the infant for "wrongful life”, and, in their own right, for the various sums of money they will be forced to expend for the long-term institutional care of their retarded child. Plaintiffs’ complaint also seeks damages for the emotional and physical injury suffered by Dolores Becker as a result of the birth of her child, as well as damages for the injury suffered by Arnold Becker occasioned by the loss of his wife’s services and the medical expenses stemming from her treatment.
Upon motion by defendants, Special Term dismissed plaintiffs’ complaint in its entirety as failing to state a cause of action. The Appellate Division modified the order of Special Term, however, sustaining plaintiffs’ complaint except to the extent that it seeks recovery of damages "for psychiatric injuries or emotional distress of plaintiff Dolores E. Becker and to the extent that plaintiff Arnold Becker’s claim for loss of services and medical expenses is based upon such psychiatric injuries”. (60 AD2d 587.) Defendants now appeal to this court on a certified question.
In the companion case, Park v Chessin, Hetty Park gave birth in June, .1969 to a baby who, afflicted with polycystic *407 kidney disease,[3] died only five hours after birth. Concerned with a possible reoccurrence of this disease in a child conceived in the future, Hetty Park and her husband, Steven Park, consulted defendants, the obstetricians who treated Hetty Park during her first pregnancy, to determine the likelihood of this contingency. In response to plaintiffs’ inquiry, defendants are alleged to have informed plaintiffs that inasmuch as polycystic kidney disease was not hereditary, the chances of their conceiving a second child afflicted with this disease were "practically nil”. Based upon this information, plaintiffs allege that they exercised a conscious choice to seek conception of a second child. As a result, Hetty Park again became pregnant and gave birth in July, 1970 to a child who similarly suffered from polycystic kidney disease. Unlike their first child, however, plaintiffs’ second child survived for two and one-half years before succumbing to this progressive disease.
Alleging that contrary to defendants’ advice polycystic kidney disease is in fact an inherited condition, and that had they been correctly informed of the true risk of reoccurrence of this disease in a second child, they would not have chosen to conceive, plaintiffs commenced this action seeking damages on behalf of the infant for "wrongful life” and, in their own right, for the pecuniary expense they have borne for the care and treatment of their child until her death. Plaintiffs’ complaint also seeks damages for the emotional and physical injuries suffered by Hetty Park as the result of the birth of her child; damages for emotional injuries and expenses suffered by Steven Park; damages for the injury suffered by Steven Park occasioned by the loss of his wife’s services; and damages on behalf of plaintiffs, as administrators of their child’s estate, for wrongful death.
Upon defendants’ motion to dismiss plaintiffs’ complaint, Special Term sustained those causes of action seeking damages for: "wrongful life”; plaintiffs’ pecuniary expense in caring for the child; Hetty Park’s emotional and physical injuries stemming from the birth; and Steven Park’s loss of his wife’s services. On appeal taken by defendants, the Appellate Division modified by further dismissing so much of plain *408 tiffs’ complaint as seeks damages "(1) for the mental anguish or emotional distress of plaintiff Hetty B. Park and (2) for the loss of that plaintiff’s services, insofar as the claim for loss of services is based upon her mental anguish or emotional distress”. (60 AD2d 80, 95.) Plaintiffs and defendants cross-appeal to this court on a certified question.
At the outset, emphasis must necessarily be placed upon the posture in which these cases are now before this court. The question presented for review is not whether plaintiffs should ultimately prevail in this litigation, but rather, more narrowly, whether their complaints state cognizable causes of action. For the purposes of our review, limited as it is to an evaluation of the sufficiency of plaintiffs’ complaints, their allegations must be assumed to be true. (See Howard v Lecher, 42 NY2d 109, 112; Cohn v Lionel Corp., 21 NY2d 559, 562; Kober v Kober, 16 NY2d 191, 193.) Accordingly, we accept, without expressing any opinion as to defendants’ liability, each of plaintiffs’ allegations: to wit, that defendants failed to inform plaintiffs accurately of the risks involved in their pregnancies, and, in Becker, of the availability of an amniocentesis test; and, that had they been accurately informed, plaintiffs would have, in Park, chosen not to conceive a second child, and, in Becker, undergone an amniocentesis test, the results of which would have precipitated a decision on their part to terminate the pregnancy.
Even as a pure question of law, unencumbered by unresolved issues of fact, the weighing of the validity of a cause of action seeking compensation for the wrongful causation of life itself casts an almost Orwellian shadow, premised as it is upon concepts of genetic predictability once foreign to the evolutionary process. It borders on the absurdly obvious to observe that resolution of this question transcends the mechanical application of legal principles. Any such resolution, whatever it may be, must invariably be colored by notions of public policy, the validity of which remains, as always, a matter upon which reasonable men may disagree.
Thoughtful analysis of the validity of "wrongful life” as an emerging legal concept requires, in the first instance, a clear understanding of the alleged wrong upon which the cause of action is predicated. Not surprisingly, the term "wrongful life” has functioned as a broad umbrella under which plaintiffs alleging factually divergent wrongs have sought judicial recog *409 nition of their claims.[4] To be distinguished from the cases before us are those in which recovery is sought for what may perhaps be most appropriately labeled "wrongful conception”, wherein parents, one of whom has undergone an unsuccessful surgical birth control procedure, have sought damages for the birth of an unplanned child. There, damages have not been sought on behalf of the child — a healthy and normal infant— but by the parents for. expenses attributable to the birth, including the pecuniary expense of rearing the child. Judicial reaction to the "wrongful conception” cause of action has been mixed.[5] In a somewhat similar vein, recovery has been sought for damages incurred upon the birth of a child attributable to a "wrongful diagnosis” of an existing pregnancy, resulting in the deprivation of the mother’s choice to terminate the pregnancy within the permissible time period. (Compare Debora S. v Sapega, 56 AD2d 841, and Ziemba v Sternberg, 45 AD2d 230 [sustaining cause of action], with Rieck v Medical Protective Co., 64 Wis 2d 514 [rejecting cause of action].)
While courts have struggled with the concepts of "wrongful conception” or "wrongful diagnosis” as cognizable causes of action, they have had little difficulty in rejecting a cause of action which may be distinguished by use of the term "wrongful birth”. In the latter cause of action an illegitimate, but *410 otherwise healthy child, seeks recovery in his or her own behalf for the injury suffered as a consequence of his or her birth into this world as a stigmatized child. To this point, courts have refused to sustain this cause of action. (See Williams v State of New York, 18 NY2d 481 [action against State which had custody of mother]; Stills v Gratton, 55 Cal App 3d 698 [action against physician for alleged negligent performance of an abortion]; Zepeda v Zepeda, 41 111 App 2d 240, cert den 379 US 945 [action against father]; Slawek v Stroh, 62 Wis 2d 295 [action against father].)
Standing distinctly apart from claims based upon a wrongful conception, a failure to diagnose a pregnancy, or an illegitimate birth, in which the essence of the wrong for which compensation is sought is the birth of a healthy and normal— albeit, unplanned — child, plaintiffs’ claims are premised upon the birth of a fully intended but abnormal child for whom extraordinary care and treatment is required. It is not contended that the defendant physicians’ treatment of Dolores Becker and Hetty Park caused the abnormalities in their infants (see Renslow v Mennonite Hosp., 67 Ill 2d 348 [sustaining cause of action based upon blood transfusion given to mother]; Sylvia v Gobeille, 101 RI 76 [sustaining cause of action based upon failure to prescribe drug during pregnancy]; cf. Jorgensen v Meade Johnson Labs., 483 F2d 237 [sustaining cause of action based upon injurious oral contraceptive]), but only that had plaintiffs been properly advised by defendants of the risks of abnormality, their infants would never have been born.
Irrespective of the label coined, plaintiffs’ complaints sound essentially in negligence or medical malpractice. As in any cause of action founded upon negligence, a successful plaintiff must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party. (See Restatement, Torts 2d, § 281; Prosser, Torts [4th ed], § 30.)
An examination of plaintiffs’ complaints leads to the conclusion that, insofar as plaintiffs allege claims on behalf of their infants, whether denominated as claims for wrongful life or otherwise, they have failed to state legally cognizable causes of action. If it be assumed that under the facts at bar defendants, as physicians, owed a duty to the infants in útero as well as to their parents (cf. Woods v Lancet, 303 NY 349), defendants’ breach of that duty may be viewed as the proxi *411 mate cause for the infants’ birth. Had Hetty and Steven Park been accurately advised by their physicians of the chances that a future child of theirs would suffer from polycystic kidney disease, they allege that they would not have chosen to conceive a second child. Similarly, had Dolores and Arnold Becker been accurately advised of the chances that their already conceived child would be born afflicted with Down’s Syndrome, and of the availability of an amniocentesis test, they allege that they would have undergone that test, and had it indicated the presence of Down’s Syndrome in their child, that they would have terminated the pregnancy within the permissible time period. (See Roe v Wade, 410 US 113; Penal Law, § 125.05.)
However, there are two flaws in plaintiffs’ claims on behalf of their infants for wrongful life. The first, in a sense the more fundamental, is that it does not appear that the infants suffered any legally cognizable injury. (Cf. Williams v State of New York, 18 NY2d 481, 484, supra.) There is no precedent for recognition at the Appellate Division of "the fundamental right of a child to be born as a whole, functional human being” (60 AD2d, at p 88). Surely the use of somewhat similar words in another context affords no such basis. (Cf. Endresz v Friedberg, 24 NY2d 478, 483, distinguishing Woods v Lancet, 303 NY 349.) Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standard or by whom would perfection be defined?
There is also a second flaw. The remedy afforded an injured party in negligence is designed to place that party in the position he would have occupied but for the negligence of the defendant. (See Martin v Dierck Equip. Co., 43 NY2d 583, 589.) Thus, the damages recoverable on behalf of an infant for wrongful life are limited to that which is necessary to restore the infant to the position he or she would have occupied were *412 it not for the failure of the defendant to render advice to the infant’s parents in a nonnegligent manner. The theoretical hurdle to an assertion of damages on behalf of an infant accruing from a defendant’s negligence in such a case becomes at once apparent. The very allegations of the complaint state that had the defendant not been negligent, the infant’s parents would have chosen not to conceive, or having conceived, to have terminated rather than to have carried the pregnancy to term, thereby depriving the infant plaintiff of his or her very existence. Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependent upon a comparison between the Hobson’s choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make. (See Smith v United States, 392 F Supp 654; Stewart v Long Is. Coll. Hosp., 35 AD2d 531, affd 30 NY2d 695; Gleitman v Cosgrove, 49 NJ 22; Jacobs v Theimer, 519 SW2d 846 [Tex]; Dumer v St. Michael’s Hosp., 69 Wis 2d 766.) Recognition of so novel a cause of action requiring, as it must, creation of a hypothetical formula for the measurement of an infant’s damages is best reserved for legislative, rather than judicial, attention. (Cf. Moore v Metropolitan Life Ins. Co., 33 NY2d 304, 313; Codling v Paglia, 32 NY2d 330, 344-345.) Accordingly, plaintiffs’ complaints insofar as they seek damages on behalf of their infants for wrongful life should be dismissed for failure to state legally cognizable causes of action.
 There remains for consideration, however, the validity of plaintiffs’ causes of action brought in their own right for damages accruing as a consequence of the birth of their infants. There can be no dispute at this stage of the pleadings that plaintiffs have alleged the existence of a duty flowing from defendants to themselves and that the breach of that duty was the proximate cause of the birth of their infants. That they have been damaged by the alleged negligence of defendants has also been pleaded. Unlike the causes of action brought on behalf of their infants for wrongful life, plaintiffs’ causes of action, also founded essentially upon a theory of negligence or medical malpractice, do allege ascertainable damages: the pecuniary expense which they have borne, and in Becker must continue to bear, for the care and treatment of their infants. Certainly, assuming the validity of plaintiffs’ allegations, it can be said in traditional tort language that but for the defendants’ breach of their duty to advise plaintiffs, *413 the latter would not have been required to assume these obligations. Calculation of damages necessary to make plaintiffs whole in relation to these expenditures requires nothing extraordinary. The fact that plaintiffs’ wrongful life claims brought on behalf of their infants do not state legally cognizable causes of action inasmuch as they fail to allege ascertainable damages in no way affects the validity of plaintiffs’ claims for pecuniary loss. Plaintiffs state causes of action in their own right predicated upon a breach of a duty flowing from defendants to themselves, as prospective parents, resulting in damage to plaintiffs for which compensation may be readily fixed. (See Jacobs v Theimer, 519 SW2d 846 [Tex], supra; Dumer v St. Michael’s Hosp., 69 Wis 2d 766, supra.) There is now no occasion, in passing on the sufficiency of the complaints to state a cause of action, to determine with particularity what items of expense or loss may properly be taken into account in computation of the damages recoverable. Such questions properly await consideration and resolution presumably on trial, after liability has been proved, if it can be. (See Johnson v Yeshiva Univ., 42 NY2d 818.)
Of course, this is not to say that plaintiffs may recover for psychic or emotional harm alleged to have occurred as a consequence of the birth of their infants in an impaired state. The recovery of damages for such injuries must of necessity be circumscribed. Controlling on this point is Howard v Lecher (42 NY2d 109, supra), in which parents of a child born afflicted with Tay-Sachs disease sought recovery for the trauma they endured witnessing their child succumb to this degenerative disorder. Similar to the present cases, the plaintiffs in Howard alleged that their physician failed to inform them of the risk involved in their pregnancy and of the availability of tests to determine whether their child would be born afflicted with Tay-Sachs disease. Had they been so advised, the plaintiffs maintained, they would have undergone the available tests, the results of which, if indicative of the presence of Tay-Sachs disease in their unborn child, would have precipitated a decision on their part to terminate the pregnancy.
While sympathetic to the plight of these parents, this court declined for policy reasons to sanction the recovery of damages for their psychic or emotional harm occasioned by the birth and gradual death of their child. To have permitted recovery in Howard, we observed, would have "inevitably led *414 to the drawing of artificial and arbitrary boundaries.” (42 NY2d, at p 113, supra.)
Contrary to the contention of the dissent, to permit plaintiffs to recover for pecuniary loss while precluding recovery for alleged emotional injuries suffered as a result of their infants’ birth does not run counter to this court’s decision in Johnson v State of New York (37 NY2d 378). In Johnson, we sustained a cause of action for emotional harm predicated upon the plaintiff’s receipt of a notice informing her of the death of her mother when, in fact, she was very much alive. In so holding, we recognized the existence of a duty on the part of the defendant flowing to the plaintiff daughter to refrain from issuing such notices in a negligent manner. The breach of that duty, we held, entitled the plaintiff to recover damages for "the proven harmful consequences proximately caused by the breach.” (37 NY2d, at p 383, supra.) Recovery was, therefore, permitted not only for the plaintiff’s pecuniary loss, but also for emotional harm caused by the tortious act.
Seizing upon the broad principle stated in Johnson, the dissent posits that recognition of a duty flowing directly from defendants to plaintiffs would require recognition of plaintiffs’ right to recover damages for emotional harm, as well as for pecuniary loss occasioned by the birth of their infants. To do so, maintains the dissent, would eviscerate our holding in Howard v Lecher (42 NY2d 109, supra). However, nothing in Johnson mandates this result.
Johnson held only that once a duty flowing directly from a defendant to a plaintiff is breached, the plaintiff may recover damages for "the proven harmful consequences proximately caused by the breach.” (37 NY2d, at p 383, supra.) We had little difficulty in concluding that the psychological impact resulting from a daughter’s receipt of a notice incorrectly indicating that her mother had expired would be debilitating. That a daughter might receive such notice with mixed emotions lacks any rational basis in human experience. The same cannot be confidently said with respect to the birth of a child, the conception of which was planned and fully desired by the parents. To be sure, parents of a deformed infant will suffer the anguish that only parents can experience upon the birth of a child in an impaired state. However, notwithstanding the birth of a child afflicted with an abnormality, and certainly dependent upon the extent of the affliction, parents may yet experience a love that even an abnormality cannot fully *415 dampen. To assess damages for emotional harm endured by the parents of such a child would, in all fairness, require consideration of this factor in mitigation of the parents’ emotional injuries. (See Restatement, Torts, § 920.) Unlike the case in Johnson where the element of mitigation was not involved, and unlike plaintiffs’ causes of action for pecuniary loss in the instant cases, calculation of damages for plaintiffs’ emotional injuries remains too speculative to permit recovery notwithstanding the breach of a duty flowing from defendants to themselves. As in the case of plaintiffs’ causes of action for damages on behalf of their infants for wrongful life, the cognizability of their actions for emotional harm is a question best left for legislative address.
Accordingly, in Becker v Schwartz the question certified is answered in the negative. The order of the Appellate Division should be modified, with costs, by dismissing plaintiffs’ complaint except to the extent that it seeks recovery of the sums expended for the long-term institutional care of their retarded child.
In Park v Chessin, the question certified is answered in the negative. The order of the Appellate Division should be modified, with costs, by dismissing plaintiffs’ complaint except to the extent that it seeks recovery for the sums expended for the care and treatment of their child until her death.

. "Down’s Syndrome” is a syndrome of mental retardation associated with a variable constellation of physical abnormalities caused by a chromosomal anomaly. (Stedman’s Medical Dictionary [23d ed].) While a normal fetus has 23 pairs of chromosomes, mongoloid children commonly have an additional chromosome in what is classified as chromosome pair 21, giving rise to the descriptive term "trisomy 21”. It is this chromosomal anomaly — a critical portion of chromosome 21 being represented in most cells three times instead of twice — which is thought to precipitate this syndrome of mental retardation. (See Lilienfeld, Epidemiology of Mongolism 1-2 [1969].)

. Amniocentesis is the "[t]ransabdominal * * * aspiration of fluid from the amniotic sac.” (Stedman’s Medical Dictionary [23d ed].) Biochemical tests are performed on the sample of amniotic fluid withdrawn, often times allowing the detection of chromosomal abnormality.

. Polycystic disease of the kidneys is a condition "characterized by numerous cysts (of varying sizes) scattered diffusely throughout the kidneys, sometimes resulting in organs that tend to resemble grapelike clusters of cysts.” (Stedman’s Medical Dictionary [23d ed].)

. For a discussion of the varied nature of the claims asserted in this area see generally Kashi, The Case of the Unwanted Blessing: Wrongful Life (31 U Miami L Rev 1409); Tedeschi, On Tort Liability for "Wrongful Life” (1 Israel L Rev 513); Note, A Cause of Action for "Wrongful Life”: (A Suggested Analysis) (55 Minn L Rev 58); Note, Torts Prior to Conception: A New Theory of Liability (56 Neb L Rev 706); Note, Remedy for the Reluctant Parent: Physicians’ Liability for the Post-Sterilization Conception and Birth of Unplanned Children (27 U Fla L Rev 158); Note, Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling (87 Yale LJ 1488); Comment, Strict Liability: A "Lady in Waiting” for Wrongful Birth Cases (11 Cal W L Rev 136); Comment, Wrongful Birth: The Emerging Status of a New Tort (8 St Mary’s LJ 140); Comment, Preconception Torts: Foreseeing the Unconceived (48 U Col L Rev 621).

. (See, e.g., La Point v Shirley, 409 F Supp 118 [unsuccessful tubal ligation]; Clegg v Chase, 89 Misc 2d 510 [unsuccessful sterilization]; Coleman v Garrison, 349 A2d 8 [Del] [unsuccessful sterilization]; Christensen v Thornby, 192 Minn 123 [unsuccessful sterilization]; Shaheen v Knight, 11 Pa D & C 2d 41 [unsuccessful sterilization]; Terrell v Garcia, 496 SW2d 124 [Tex], cert den 415 US 927 [unsuccessful tubal ligation] [rejecting "wrongful conception” cause of action]; contra, e.g., Bishop v Byrne, 265 F Supp 460 [unsuccessful sterilization]; Custodio v Bauer, 251 Cal App 2d 303 [unsuccessful sterilization]; Anonymous v Hospital, 33 Conn Supp 125 [unsuccessful tubal ligation]; Betancourt v Gaylor, 136 NJ Super 69 [unsuccessful sterilization]; Bowman v Davis, 48 Ohio St 2d 41 [unsuccessful tubal ligation]; cf. Troppi v Scarf, 31 Mich App 240 [negligent filling of birth control prescription] [recognizing cause of action for "wrongful conception”].)