OPINION OF THE COURT
Eileen Bransten, J.
Pursuant to CPLR 3211 (a) (7), defendant Medical Offices for Human Reproduction, doing business as Center for Human Reproduction (the Center), moves for an order dismissing the complaint of plaintiffs Josephine Paretta, Gerard Paretta and Theresa Paretta, an infant under the age of 14 years by her parents and natural guardians, Josephine Paretta and Gerard Paretta, individually. The Center urges that dismissal is warranted on the grounds that New York law does not recognize claims for “wrongful life.” Defendants Dr. Steven Lindheim (Dr. Lindheim), New York-Presbyterian Hospital, sued herein as Columbia-Presbyterian Medical Center, the Trustees of Columbia University in the City of New York, sued herein as Center for Women’s Reproductive Care at Columbia University (hospital), and Dr. Mark Sauer (Dr. Sauer) cross-move for dismissal of the action.
Additionally, plaintiffs cross-move for summary judgment.
Background
On January 16, 1998, Josephine and Gerard Paretta (the Parettas) sought fertility treatment from physicians affiliated with the Center and the hospital. Dr. Sauer, one of the physicians, recommended that Mrs. Paretta undergo in vitro fertilization using an ovum donor, and that the couple proceed in the ovum donor program. Dr. Sauer allegedly further recommended that the Parettas use Mr. Paretta’s sperm and “the ova of a prescreened oocyte donor.” (Affirmation in opposition to defendant’s motion to dismiss/summary judgment and in support of plaintiffs cross motion for summary judgment [opp. affi] H 8.)
The couple agreed to proceed through the program and met with Dr. Lindheim, the program director. Dr. Lindheim provided the Parettas with detailed information about the potential oocyte donor, specifically, that she was white, a second-time donor, a heterosexual, an only child of an Irish father and English mother, a Protestant, that she was five feet six inches tall, that she had dark brown hair and brown eyes, was long necked with small eyes and ears, that she had a short *570 thin nose, dimples and high cheekbones, and that she did not have freckles. Dr. Lindheim also allegedly told the Parettas that the donor did not have a history of mental illness or genetic diseases. (Opp. aff. 10.)
After hearing about the potential donor, the Parettas decided to use her ova.
The custom and practice of the program was to screen donors for various diseases, including cystic fibrosis. “[T]he practice was to inform the patient that there was a donor or that a potential donor was a carrier, and if they elected to proceed forward, they had the option or choice to be screened to see if there was a carrier status.” (Deposition transcript of Dr. Lindheim at 57.)
No one remembers ever telling the Parettas that the available donor was a carrier of cystic fibrosis and Mr. Paretta was not tested to ascertain whether he was a carrier of the disease.
Conception was successful, and on May 7, 2000, Theresa Paretta was born. Tragically, Theresa was diagnosed with cystic fibrosis, a chronic debilitating progressive genetic disease that is inherited from both parents.
For the first two months, Theresa was in intensive care. She underwent several surgeries and wore a colostomy bag for a month. According to plaintiffs, she “will have to take medication for the rest of her life * * * [and] will remain under a doctor’s and/or hospital’s care for the rest of her life.” (Juliann L. Safko, affirmation in support [Safko aff.], exhibit A, verified complaint, 19.)
On July 7, 2000 — exactly two months after Theresa’s birth— Dr. Sauer wrote the Parettas:
“I was sorry to learn of your daughter’s serious illness. Your egg donor was screened for Cystic Fibrosis, and was found to be a carrier. We have no record of genetic screening in your husband. I am aware that Dr. Lindheim was your primary physician but he is no longer at Columbia University. You may wish to direct your inquiries to him at his private office in Norwalk, CT.
“We strive to provide excellent care here, and I regret that this incident occurred. I sincerely hope that your daughter improves and that she thrives despite the illness.” (Opp. aff, exhibit 7.)
In October 2000, plaintiffs commenced this action, alleging defendants committed medical malpractice when they failed to *571 properly screen the egg and inform the Parettas that the egg tested positive for the cystic fibrosis gene. According to the complaint, the donor “was screened and tested, she was found to be a positive carrier of the [cystic fibrosis gene] and plaintiffs were never informed.” {Id., exhibit A, verified complaint, 22.) The complaint further alleges that defendants were negligent in failing to test Mr. Paretta for the cystic fibrosis gene as it was only after the baby’s birth that the couple learned that both the oocyte donor and Mr. Paretta carried the gene for the disease. {Id., exhibit A, verified complaint, U 22.) The Parettas, on behalf of themselves individually and Theresa, allege, among other things, that:
• “As a direct and proximate result of Defendants Lindheim and Sauer’s breach of the standard of care, the Plaintiff Gerard Paretta emotionally suffers and will continue to emotionally suffer as a parent of a child affected with [cystic fibrosis] which is [a] chronic, debilitating and painful disease for the rest of her life.” (fl 31.)
e “As a result of the Defendants’ breach, Plaintiffs have suffered damages representing medical, surgical, hospital costs, lost wages and/or other damages.” fl[ 48.)
• “Plaintiffs have also incurred emotional pain and suffering as a result of Defendants’ breach.” (fl 49.)
e “The imposition of punitive damages on the Defendants for the egregious, grossly negligent and reckless conduct of Defendants Medical Offices for Human Reproduction, Center for Women’s Reproductive Care at Columbia University, The Center for Human Reproduction and Columbia-Presbyterian Medical Center employees is justified on the grounds that the Defendants authorized/ ratified the conduct.” (fl 53.)
• “The Defendants Medical Offices for Human Reproduction, Center for Women’s Reproductive Care at Columbia University, The Center for Human Reproduction and Columbia-Presbyterian Medical Center breached its [sic] duty of supervision over employees Sauer and Lindheim by not supervising them or the IVF program adequately.” (1j 56.)
*572 The Center now moves for dismissal of the complaint, arguing that Theresa Paretta cannot maintain a cause of action for “wrongful life.” Relying on Becker v Schwartz (46 NY2d 401 [1978]), the Center contends that an infant cannot recover damages for being born with a genetic disorder. The Center further urges that the Parettas cannot maintain causes of action for emotional distress or seek compensation for lost wages as a result of caring for Theresa. Both the hospital and Dr. Sauer cross-move for dismissal on the identical grounds.
Dr. Lindheim cross-moves for dismissal of “claims for wrongful life, emotional distress, lost wages and punitive damages, because New York does not recognize these causes of action.” (Corey L. Wishner affirmation [Wishner aff.] 7.)[1]
Plaintiffs oppose all of defendants’ motions and cross motions, and cross-move for summary judgment. They maintain that this case is not one for “wrongful birth or wrongful life”; rather, the complaint alleges medical malpractice, negligence and lack of informed consent. (Opp. aff. If 20.) The Parettas maintain that “this is also a case of negligent preconception and pre-implantation counseling.” (Id. If 21.) Relying on information from the American Society for Reproduction Medicine, the Parettas argue that defendants should have conducted a preimplantation genetic diagnosis test to ascertain whether the embryo had genetic diseases. (Id. ff 24.) Plaintiffs maintain that defendants were negligent in failing to test the egg, sperm and embryo before implantation. Moreover, they failed to obtain proper informed consent as the Parettas were never given information about the potential for cystic fibrosis. Indeed, plaintiffs contend that Dr. Lindheim and Dr. Sauer “introduced the agent, which caused [cystic fibrosis] and manipulated the embryonic material [that] was implanted into Mrs. Paretta.” (Id. 1f 32.)
Relying on Perry-Rogers v Obasaju (282 AD2d 231 [1st Dept 2001], lv dismissed 96 NY2d 936 [2001], 97 NY2d 638 [2001]), the Parettas allege that their emotional distress is compensable as the “stress, depression, anxiety and loss of consortium *573 were foreseeable and are not unexpected or aberrations.” (Id. H40.)
They also argue that the doctrine of res ipsa loquitur entitles them to summary judgment as cystic fibrosis in an infant conceived through in vitro fertilization “would occur only as a result of negligence.” (Opp. aff. H 72.) They further assert that the injury was caused by an agency or instrumentality exclusively within the defendants’ control, was due to defendants’ actions, and that the true explanation of the event is more readily accessible to defendants. (Id. 1f1f 71-74.)
Analysis
In Becker v Schwartz (46 NY2d 401 [1978]), the Court of Appeals addressed two companion cases raising the issue of an infant’s potential recovery for being born with a genetic disease.
Becker v Schwartz involved Dolores Becker who conceived a child when she was 37 years of age. (Id. at 405.) She engaged the professional services of defendants, physicians practicing obstetrics and gynecology. In May 1975, she gave birth to a retarded and brain-damaged infant who suffered from Down’s syndrome. The Beckers — on behalf of themselves and their infant — sued defendants, alleging that they had never been advised of the heightened risk of a Down’s syndrome baby in women over 35 or of the availability of an amniocentesis test to determine whether their fetus had Down’s syndrome.
Park v Chessin — Becker’s companion case — related to claims raised by Hetty Park, her husband and their horribly sick infant. In 1969, Hetty Park gave birth to a baby afflicted with polycystic kidney disease. The baby died five hours after birth. Considering another pregnancy, Mrs. Park and her husband consulted with defendants, the obstetricians who treated her during the earlier pregnancy, and asked whether the disease was hereditary. Defendants allegedly informed her that “the chances of their conceiving a second child afflicted with this disease were ‘practically nil.’ ” (Id. at 407.) Mrs. Park became pregnant, and in July 1970 gave birth to a child who also suffered from polycystic kidney disease. The Parks’ second diseased child survived two and a half years and then succumbed to the illness. The Parks sued defendants alleging that, contrary to their assertion, polycystic kidney disease is inherited. They maintained that had they been correctly informed of the risks, they would not have chosen to conceive another baby. The Parks sought recovery for emotional injuries and the pecuniary expense borne for the care and treatment of *574 their child until its death. Mr. Park further sought recovery for loss of his wife’s services. The Parks also asserted claims for “wrongful life” on behalf of the baby as well as an action for wrongful death.
The Court of Appeals addressed whether the Park and Becker plaintiffs had cognizable causes of action. {Id. at 408.) The Court explained that “irrespective of the label coined, plaintiffs’ complaints sound essentially in negligence or medical malpractice.” {Id. at 410.) The Court held that regardless of the denomination of the nature of their claims, the infants could not recover because “it does not appear that [they] suffered any legally cognizable injury.” {Id. at 411.) Because a child does not have a fundamental right to be born free of disease, the Court refused to subject the obstetricians and gynecologists to liability to the infants. “Whether it is better never to have been born at all than to have been born with even gross deficiencies,” the Court stated, “is a mystery more properly left to the philosophers and the theologians.” {Id. )[2] The Becker Court, however, was perfectly clear in determining that the parents could recover in their own rights for damages resulting from the birth of their diseased infants. {Id. at 412.) The Court held:
“There can be no dispute at this stage of the pleadings that plaintiffs have alleged the existence of a duty flowing from defendants to themselves and that the breach of that duty was the proximate cause of the birth of their infants. [The parents, moreover,] do allege ascertainable damages: the pecuniary expense which they have borne, and in Becker must continue to bear, for the care and treatment of their infants. Certainly, assuming the validity of plaintiffs’ allegations, it can be said in traditional tort language that but for the defendants’ breach of their duty to advise plaintiffs, the latter would not have been required to assume these obligations. Calculation of damages neces *575 sary to make plaintiffs whole in relation to these expenditures requires nothing extraordinary. The fact that plaintiffs’ wrongful life claims brought on behalf of their infants do not state legally cognizable causes of action inasmuch as they fail to allege ascertainable damages in no way affects the validity of plaintiffs’ claims for pecuniary loss. Plaintiffs state causes of action in their own right predicated upon a breach of duty flowing from defendants to themselves, as prospective parents, resulting in damage to plaintiffs for which compensation may be readily fixed.” (Id. at 412-413.)
For policy reasons, however, the Court rejected the parents’ claims for emotional distress occasioned by the birth of the diseased children and the trauma they endured witnessing their children suffer from horrible debilitating disorders. (Id. at 413-414.) Explaining that recovery for psychic or emotional harm based on the birth of an infant in an impaired state “must of necessity be circumscribed,” the Court reasoned that: “notwithstanding the birth of a child afflicted with an abnormality, and certainly depending on the nature of the affliction, parents may yet experience a love that even an abnormality cannot fully dampen.” (Id. at 414-415.) The Court concluded that recovery for emotional distress as a result of the birth of a diseased child “is a question best left for legislative address.” (Id. at 415; see also, Howard v Lecher, 42 NY2d 109 [1977] [parents of child born with Tay-Sachs disease could not recover against doctor for emotional distress]; Goldstein v Ob-Gyn Assoc., 170 AD2d 374 [1st Dept 1991], appeal dismissed 78 NY2d 1006 [1991].)
Becker makes clear that the Parettas cannot recover on Theresa’s behalf or recover for emotional distress as a result of her birth with a congenital disease. (See also, Keselman v Kingsboro Med. Group, 156 AD2d 334, 335 [2d Dept 1989] [infant with genetic anomaly that led to death could not recover and parents could not recover for any psychic or emotional harm alleged to have occurred as a consequence of the birth of their infant in an impaired state], appeal dismissed 76 NY2d 845 [1990]; Alquijay v St. Luke’s-Roosevelt Hosp. Ctr., 63 NY2d 978 [1984].)
Becker unquestionably is distinguishable in that, unlike here, the plaintiffs did not contend that the defendant physicians’ treatment caused the abnormalities in the child. Here, by contrast, the Parettas maintain that the defendant doctors *576 were actually responsible for Theresa’s conception, had a role in her genetic composition, and combined the sperm and egg both of which carried cystic fibrosis. Theresa, however, like any other baby, does not have a protected right to be born free of genetic defects. A conclusion to the contrary, permitting infants to recover against doctors for wrongs allegedly committed during in vitro fertilization would give children conceived with the help of modern medical technology more rights and expectations than children conceived without medical assistance. The law does not recognize such a distinction and neither will this court.
Likewise, Becker establishes that there can be no recovery for the emotional distress a parent may experience as a result of having a child with a genetic disease. There is no compelling legal authority permitting a distinction where a child has been conceived with the help of medical technology and is born with a genetic disease. This court cannot treat the emotional distress and psychic pain suffered by parents who give birth to a sick child after in vitro fertilization any differently from that sustained by other parents. The emotional distress experienced as a result of watching a genetically diseased child suffer, horrible as it may be, is the same regardless of how the child was conceived. It unfortunately is not compensable.
The Parettas rely on Perry-Rogers v Obasaju (282 AD2d 231 [2001]), and argue that this case, like Perry-Rogers, is not one for wrongful life. They also maintain, based on Perry-Rogers and Martinez v Long Is. Jewish Hillside Med. Ctr. (70 NY2d 697 [1987]), that they can recover for their emotional distress. Those cases, however, are readily distinguishable.
Perry-Rogers involved mistaken implantation of plaintiffs’ embryo into the uterus of another woman. In that case, the Appellate Division, First Department, did not address an infant’s ability to recover for hereditary diseases. With regard to a claim for emotional distress, the Court made plain that, unlike here,
“plaintiffs [did not] seek damages for the emotional harm caused by the birth of a sick * * * child * * *. Rather, plaintiffs [sought] damages for the emotional harm caused by their having been deprived of the opportunity of experiencing pregnancy, prenatal bonding and the birth of their child, and by their separation from the child for more than four months after his birth.” (Perry-Rogers v Obasaju, 282 AD2d at 231 [emphasis added].)
*577 Martinez is also a very different case. There, the Court of Appeals allowed recovery for emotional distress to a woman who, while pregnant, was negligently advised that her baby would be born with a congenital birth defect. Consequently, she terminated the pregnancy. She later learned that the medical advice was erroneous and that the abortion was entirely unnecessary. Mrs. Martinez alleged that abortion violated her deep-seated convictions and that she therefore suffered mental anguish and depression. (Martinez v Long Is. Jewish Hillside Med. Ctr., 70 NY2d at 699.) In permitting Mrs. Martinez to pursue a claim for emotional distress, the Court emphasized that the “emotional distress for which she [sought] recovery [did] not derive from what happened to the fetus; it derives from the psychological injury directly caused by her agreeing to an act which, as the jury found, was contrary to her firmly held beliefs.” (Id.) Here, by contrast, the Parettas are seeking to recover for emotional injuries caused by the birth of a sick child. That issue is squarely governed by Becker and unchanged by Martinez.
In addition, because Mr. Paretta’s derivative claim for loss of consortium appears to be predicated on and inextricably interwoven with the emotional injuries suffered by Mrs. Paretta, that claim too must be dismissed. (See, e.g., James v Middletown Community Health Ctr., 278 AD2d 280, 281 [2d Dept 2000]; Goldstein v Ob-Gyn Assoc., 170 AD2d 374 [1991].)
That plaintiffs cannot recover on Theresa’s behalf and cannot recover for emotional distress or loss of services, by no means requires dismissal of the action. Indeed, Becker makes abundantly clear that the Parettas can pursue recovery for the pecuniary expense they have borne and continue to bear for the care and treatment of their sick infant. (See also, BaniEsraili v Lerman, 69 NY2d 807, 808 [1987] [father of baby born with blood disease could recover for “amount that represents his legally cognizable injury, namely the increased financial obligation arising from the extraordinary medical treatment rendered the child during minority”].) Thus, the action will go forward.
Furthermore, at this stage and on this record, the court will not dismiss plaintiffs’ allegation that they are entitled to punitive damages. Plaintiffs have alleged grossly negligent or reckless conduct, and defendants have not established that dismissal of these contentions is warranted as a matter of law. (See, Giblin v Murphy, 73 NY2d 769, 772 [1988]; see also, Dahlke v Frankel, 267 AD2d 54 [1st Dept 1999] [given deposi *578 tion testimony claim for punitive damages in medical malpractice case was not plainly without merit].) It is certainly possible that defendants’ conduct was at the very least grossly negligent — possibly even fraudulent — and that defendants could have prevented the Parettas from having a baby with cystic fibrosis. There is evidence that defendants may have known that the egg donor was a cystic fibrosis carrier; yet, they failed to inform the Parettas or test Mr. Paretta’s sperm to assess whether he too was a carrier. Had the Parettas been informed of the potential for cystic fibrosis they themselves may have chosen to have Mr. Paretta tested or may have altogether opted on using a different egg donor.
Based on defendants’ submissions, the court also refuses to dismiss claims for compensation related to Mrs. Paretta’s decision to leave her job so that she could care for Theresa on a full-time basis. While the court is far from convinced of the viability of recovery of lost earnings, based on the case law provided by the defendants it cannot rule it out completely. Nor is the court convinced, based on defendants’ submissions, that Mrs. Paretta cannot recover for the reasonable value of her services associated with the tremendous amount of care and attention that must be provided to her child.
In seeking dismissal of such claims, defendants rely solely on case law establishing that “parents of an unwanted, but otherwise healthy and normal child” cannot recover the ordinary costs of raising the child. (See, Weintraub v Brown, 98 AD2d 339, 340, 342 n 2 [2d Dept 1983] [stating that there were “no allegations that the child (was) other than normal and healthy” and noting that parents can recover “the costs for the extraordinary care and treatment of their intended but abnormal child”]; see also, Jean-Charles v Planned Parenthood Assn. of Mohawk Val., 99 AD2d 542 [2d Dept 1984] [no recovery for costs of raising healthy but unwanted child “nor may there be recovery for future lost wages resulting from the mother’s inability to carry on a job by reason of her obligation to raise the child”].)
Here, by contrast, the Parettas are caring for a very dependent child with heightened needs. Like in Becker, and unlike the infants in Weintraub and Jean-Charles, Theresa was born diseased.
In sum, it is hard to ignore defendants’ alleged role in Theresa’s illness. Indeed, it is difficult to conceive that parents, concerned about whether the egg donor had freckles and with the size of her eyes and ears, would not have expected full *579 disclosure of information regarding whether she carried cystic fibrosis. Thus, the Parettas will be permitted to vigorously pursue recovery.
On this record, however, the court will not award the Parettas summary judgment. At the outset, and most important, it is well settled that application of the res ipsa loquitur doctrine as a basis for awarding summary judgment is inappropriate. (See, e.g., Veltri v Stahl, 155 AD2d 287, 288 [1st Dept 1989]; see also, Capolongo v Giant Carpet, 292 AD2d 331 [2d Dept 2002]; Vaynberg v Provident Operating Corp., 269 AD2d 442 [2d Dept 2000].) Additionally, plaintiffs have not submitted adequate evidence establishing that they are entitled to judgment as a matter of law. Specifically, there are no affidavits from the plaintiffs or from any medical experts, leaving unresolved many factual questions that must await further determination.
Accordingly, it is ordered that defendants’ motions and cross motions to dismiss the action are denied except that all causes of action on behalf of Theresa Paretta are dismissed, and all causes of action for emotional distress and loss of services are dismissed. Additionally, to the extent that the sixth cause of action can be construed as a claim for improper supervision against Dr. Lindheim, the cause of action is dismissed as against him. It is further ordered that plaintiffs’ cross motion for summary judgment is denied.

. Dr. Lindheim moves for dismissal of plaintiffs’ sixth cause of action, which is for improper supervision. Plaintiffs do not oppose this portion of Dr. Lindheim’s motion. In fact, their sixth cause of action appears to be directed at Medical Offices for Human Reproduction, Center for Women’s Reproductive Care at Columbia University, the Center for Human Reproduction and Columbia-Presbyterian Medical Center. Accordingly, to the extent the sixth cause of action can be construed as stating a claim against Dr. Lindheim, it is dismissed as against him.

. The Court also denied recovery on the ground that recoverable damages are limited to those “necessary to restore the infant to the position he or she would have occupied were it not for the failure of the defendant to render advice to the infant’s parents in a nonnegligent manner.” (Id. at 411-412.) Had the doctors not been negligent, the infants would never have been born. Therefore, courts would be faced with comparing the value of life in an impaired state and no life at all. The Court concluded that allowing such recovery would be “best reserved for legislative, rather than judicial attention.” (Id.)