**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3460

_____

D.D., on behalf of herself and as p/n/g
of her minor daughter B.D.,
                                        Appellant

v.

IDANT  LABORATORIES,
as a Division of DAXOR CORPORATION

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 08-cv-04075)
District Judge:  Honorable Thomas N. O'Neill, Jr.

_____

Argued:  March 9, 2010

_____

Before: McKEE, BARRY and GREENBERG, <u>Circuit Judges</u>

(Opinion Filed:  April 1, 2010)

_____

Daniel L. Thistle, Esq. (Argued)
Suite 2350
1845 Walnut Street
Philadelphia, PA 19103-0000

<u>Counsel for Appellant</u>

Rory L. Lubin, Esq. (Argued)
Wilson, Elser, Moskowitz, Edelman & Dicker
3 Gannett Drive
White Plains, NY 10604

Counsel for Appellee

---

OPINION

---

BARRY, Circuit Judge

D.D., on behalf of herself and as p/n/g of her minor daughter, B.D., appeals from orders of the U.S. District Court for the Eastern District of Pennsylvania dismissing her claims against Idant Laboratories ("Idant"). The District Court concluded that D.D.'s claims were barred by the applicable statute of limitations, and that her claims on behalf of B.D. failed to state an actionable theory of harm or damages. We will affirm.

## BACKGROUND

Because the parties are familiar with the facts, we include only those that are material to our discussion. D.D. sought to be artificially inseminated with semen provided by Idant. She selected the semen of Donor G738, was instructed that Donor G738's specimen had been tested in conformity with New York Health Regulations, and arranged to have the semen shipped to her physician. Following successful insemination in April 1995, B.D. was born on January 4, 1996. Shortly after B.D.'s birth, D.D. began to notice that B.D. was displaying abnormalities such as "trouble sleeping, tantrums, and anxiety as well as developmental delays." (App. at 78.) In December 1997, the

Children's Hospital of Philadelphia diagnosed B.D. as a "Fragile X" carrier.[1]  In February 1998, SmithKline Beecham Clinical Laboratories ("SmithKline") reported genetic test results showing that D.D. was not a "Fragile X" carrier, and in May 1998, reported that Donor G738 was a carrier of the "Fragile X permutation." (*Id.* at 177.)  SmithKline also confirmed B.D.'s status as a "Fragile X" carrier, and indicated that "this finding is not associated with any clinical manifestations, but may have reproductive ramifications." (*Id.* at 181.)

D.D. alleges that Idant attempted to conceal the connection between "Fragile X" and B.D.'s disabilities.  In 1998, Idant forwarded to D.D.'s counsel a letter from Fred Gilbert, M.D., of Cornell University Medical College, which stated that the "*fact that B.D. [ ] is retarded must be attributed to something other than her Fragile X carrier state.*" (*Id.* at 112.)  The letter explained that B.D.'s status as a "Fragile X" carrier "is associated with normal appearance and development, and a risk of retardation in her offspring." (*Id.*)  Idant forwarded a second letter, authored by Professor Paul G. McDonough, M.D. of the Medical College of Georgia, which also maintained that the "retardation exhibited by B.D. must be due to a cause other than a mutation . . . ." (*Id.* at 113.)  That letter added that it "is important to perform cytogenetic studies, and other evaluations on B.D. based upon her specific clinical findings." (*Id.*)  It appears that those letters were sent in response to a draft complaint submitted to Idant alleging that "the

---

[1] As the District Court has explained, "Fragile X" is "a genetic syndrome which results in a spectrum of physical, intellectual, emotional and behavioral characteristics which range from severe to mild in manifestation." (App. at 5.)  The gene responsible for "Fragile X" was first discovered in 1991; there is no known cure.

'Fragile X Syndrome' was caused by Donor G738 and passed on to B.[D]. . . . [and as] a direct result of being born with the 'Fragile X Syndrome,' [B.D.] has permanently impaired developmental communication, play, motor planning, sensory and cognitive skills . . . [and] a fifty-percent chance of passing" Fragile X to her issue. (App. at 167-68.) D.D. argues that she relied on these letters "telling her that her daughter's problems were not caused by the sperm sold by [Idant]." (Appellant's Br. at 8.)

D.D. claims that in August 2006, Dr. Randi Hagerman, a professor at the University of California at Davis, "indicated to [D.D.] that there was a connection between the purchase from defendant and [B.D.'s] developmental problems." (App. at 79.) She further claims that it was "not until 2008 when a report was published in *The American Journal of Medical Genetics Part A* titled 'A Girl With Fragile X Permutation From Sperm Donation' that [she] could know definitely that [B.D.'s] Fragile X developmental and other problems were caused by the sperm sold by Idant." (*Id.* at 80.) That report recommended "fragile X DNA screening of male and female candidates for gamete donation since this mutation is common in the general population and can cause clinical involvement in carriers." (*Id.* at 73.)

## PROCEDURAL HISTORY

On July 16, 2008, D.D. filed a complaint against Idant in the Philadelphia County Court of Common Pleas alleging negligence, breach of contract, third-party beneficiary breach of contract, breach of express and implied warranties of merchantability, third-party beneficiary breach of express and implied warranties of merchantability, negligent misrepresentation, strict products liability, and negligent infliction of emotional distress,

all because of Idant's failure to identify Donor G738 as a "Fragile X" carrier. D.D. cites as her damages the costs and services needed by B.D. for the "treatment of the characteristics of Fragile X Syndrome." (*Id.* at 50.) She cites as well the medical problems B.D. faces in the future and the costs associated with them, and B.D.'s "permanent loss of the joys and comforts of everyday life." (*Id.* at 52.) Idant removed the action to the U.S. District Court. On March 31, 2009, the Court dismissed D.D.'s individual claims, finding that they were time-barred under Pennsylvania's applicable statute of limitations. An amended complaint was filed on B.D.'s behalf, but the complaint was dismissed on the ground that New York law does not permit an action for "wrongful life."

## DISCUSSION

Our review of the District Court's orders is plenary. *See Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). A court should only grant a Rule 12(b)(6) motion to dismiss where the plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Fawler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009). We have jurisdiction pursuant to 28 U.S.C. § 1291.[2]

A.      **Statute of Limitations**

The District Court dismissed D.D.'s claims on the ground that they were barred by

---

[2]  We reject, without further discussion, Idant's arguments that we lack jurisdiction over D.D.'s claims.

the applicable statute of limitations.[3]  D.D. was inseminated with Donor G738's semen in 1995, B.D. was born in 1996, and it was shortly after her birth that D.D. began to see problems with B.D.'s development.  Whatever specific date is used for the date of injury, the date on which this action was filed – July 16, 2008 – is well outside of Pennsylvania's prescribed statute of limitations periods for both tort and contract claims.  *See* 42 Pa. Cons. Stat. Ann. § 5524(7) (two year statute of limitations for tort claims); 42 Pa. Cons. Stat. Ann. § 5525 (four year statute of limitations for contract claims).  "Once the prescribed statutory period has expired, the individual is barred from bringing suit, unless some exception which tolls the statute of limitations can be proven."  *Ward v. Rice*, 828 A.2d 1118, 1121 (Pa. Super. Ct. 2003).[4]

D.D. argues that the statute of limitations was tolled because she relied on the letters of Drs. Gilbert and McDonough and because she was unable to know that B.D.'s "Fragile X, developmental, and other problems were caused by the sperm sold by Idant" until the 2008 publication of "A Girl With Fragile X . . . ."  (Appellant's Br. at 23.)  Stated generally, she bases her argument for tolling on Pennsylvania's discovery rule and fraudulent concealment doctrine.[5]

---

[3]  D.D. does not dispute the District Court's ruling in this diversity action that Pennsylvania law dictates the applicable statute of limitations and New York law governs all substantive claims.

[4]  B.D. is not yet eighteen years old, and the District Court correctly found that her claims were not time-barred.  *See* 42 Pa. Cons. Stat. Ann. § 5533(b).

[5]  "Whether a complaint is timely filed within the limitations period is a matter of law for the court to determine."  *Lazarski v. Archdiocese of Phila.*, 926 A.2d 459, 461 (Pa. Super. Ct. 2007) (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)).

*1.      Tolling Pursuant to the Discovery Rule*

"The discovery rule . . . tolls the running of the applicable statute of limitations when an injury or its cause was not known or reasonably knowable." *Simon v. Wyeth Pharms., Inc.*, __ A.2d __, 2009 WL 5154031, at *5 (Pa. Super. Ct. Dec. 31, 2009); *see Wilson v. El-Daief*, 964 A.2d 354, 359 (Pa. 2009). Tolling is applied where "despite the exercise of reasonable diligence," the plaintiff could identify neither her injury nor its source within the limitations period. *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983). Reasonable diligence is an objective test, but it is also "sufficiently flexible . . . to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) (citations omitted). Demonstrating reasonable diligence requires a plaintiff to establish that she displayed "those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their own interests and the interests of others." *Wilson*, 964 A.2d at 363 n.6 (citation omitted). With regard to identifying the injury or its cause, "plaintiffs need not know that they have a cause of action, or that the injury was caused by another party[] . . . , for once a plaintiff possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim." *Romah v. Hygienic Sanitation Co.*, 705 A.2d 841, 857 (Pa. Super. Ct. 1997) (quoting *Vernau v. Vic's Mkt., Inc.*, 896 F.2d 43, 46 (3d Cir. 1990)).

As far back as 1997, D.D. knew that B.D. was a "Fragile X" carrier. By early 1998, she knew that she was not a carrier, and in May of that year, she knew that Donor

G738 was and that males who possess the Fragile X syndrome pass it to all of their daughters. It was based on this knowledge that her counsel was able to send Idant a draft complaint alleging that B.D.'s numerous deficiencies were the result of her "'Fragile X syndrome' . . . caused by Donor G738." (App. at 167.) D.D. alleges that the letters of Drs. Gilbert and McDonough undermined any suspicion she might have had that B.D.'s disabilities were related to Donor G738 and Fragile X. If that is so, she clearly failed to demonstrate "those qualities of attention, knowledge, intelligence and judgment which society requires of its members . . . ." *See Wilson*, 964 A.2d at 363 n.6. A reasonable person would have questioned some of what was in those letters coming, as they did, from the defendant's doctors, or at least have done what Dr. McDonough said it was important to do: "perform cytogenetic studies, and other evaluations." (App. at 113.) In any event, we note that although the letters say that B.D.'s mental retardation was not caused by her Fragile X carrier state, they are consistent in important respects with the SmithKline reports on Donor G738 and B.D. – they agree, for example, that she is a Fragile X carrier whose children will be at increased risk of developing the full Fragile X syndrome including retardation. Having "possess[ed] the salient facts concerning the occurrence of" the injury alleged here and what caused it at the time the draft complaint was prepared, the discovery rule did not toll D.D.'s cause of action beyond 1998. *See Romah*, 705 A.2d at 857 (citation omitted).

## 2. *Tolling Pursuant to Fraudulent Concealment Doctrine*

"[I]n order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon

which the plaintiff[] justifiably relied." *Lazarski v. Archdiocese of Phila.*, 926 A.2d 459, 465 (Pa. Super. Ct. 2007) (citations omitted); *see Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) ("Pennsylvania's fraudulent concealment doctrine tolls the statute of limitations where through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry" (internal quotations omitted).). The plaintiff bears the burden of proving fraudulent concealment, and must "show that he exercised reasonable diligence in attempting to uncover the relevant facts." *Forbes v. Eagleson*, 228 F.3d 471, 487 (3d Cir. 2000). As is the case with the discovery rule, "the fraudulent concealment doctrine does not toll the statute of limitations where the plaintiff knew or should have known of his claim despite the defendant's misrepresentation or omission." *Mest*, 449 F.3d at 516.

Again, reasonable minds cannot disagree. D.D. does not identify the "affirmative independent act of concealment" on which she relied, or what it was in those letters that was fraudulent. Moreover, the medical malpractice cases that D.D. cites are easily distinguishable involving, as they do, plaintiffs who relied on the assurances of their own physicians, and who therefore were justified in relaxing their vigilance. *See Ayers v. Morgan*, 154 A.2d 788, 793 (Pa. 1959); *Ward*, 828 A.2d at 1125*; Barshady v. Schlosser*, 313 A.2d 296, 299 (Pa. Super. Ct. 1973). And, as noted above, the substance of the Idant letters is consistent in important respects with the SmithKline reports.

Because D.D. was aware of both an injury and its source in 1998, her claims were untimely and were properly dismissed.

C.      The Merits of the Claims on Behalf of B.D.

D.D. argues on behalf of B.D. that the claims for strict products liability, third party beneficiary breach of express warranty, third party beneficiary breach of implied warranty of merchantability, and third party beneficiary breach of contract were wrongfully dismissed as claims based on an impermissible wrongful life theory.

Guided by the principle that "[w]hether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians," *Becker v. Schwartz*, 46 N.Y.2d 401, 411 (1978), New York courts have held that "a cause of action may not be maintained on behalf of an infant plaintiff based on a claim of wrongful life . . . ," *Sheppard-Mobley v. King*, 830 N.E.2d 301, 305 (N.Y. 2005) (quotations omitted). Wrongful life cases pose particularly thorny problems in the damages context: "Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependant upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make." *Becker*, 46 N.Y.2d at 412.

Regardless of whether a particular cause of action is denominated as one of contract, products liability, or something else, all of the claims on behalf of B.D. suffer from the same defect: the lack of a cognizable injury. *See Paretta v. Med. Offices for Human Reprod.*, 760 N.Y.S.2d 639, 644 (N.Y. Sup. Ct. 2003) ("[R]egardless of the denomination of the nature of their claims, the infants could not recover because 'it does not appear that [they] suffered any legally cognizable injury'" by being born with illness (quoting *Becker*, 46 N.Y.2d at 411).). In arguing that the defective semen left B.D.

impaired and in need of costly treatment, D.D. is essentially saying that B.D.'s genetic makeup is her injury. The difficulties that B.D. now faces and will face are surely tragic, but New York law, which controls here, states that she "like any other [child], does not have a protected right to be born free of genetic defects." *See id*. at 646. To find the contrary would invite litigation for any number of claimed injuries and, even more problematic, require courts to identify certain traits below some arbitrarily established marker of perfection as "injuries." Accordingly, we conclude that, applying New York law, the causes of action asserted on B.D.'s behalf fail to identify damages different from those for wrongful life.

**CONCLUSION**

The orders of the District Court will be affirmed.